065 094

ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JUN 30 2006
U.S. COURT OF FEDERAL CLAIMS

**File No.**

GENERAL ELECTRIC COMPANY and SUBSIDIARIES,

Plaintiff,

v.

UNITED STATES OF AMERICA,

06-489 T

Defendant.

**COMPLAINT**

General Electric Company ("GE") and Subsidiaries ("plaintiff") brings this action against defendant, the United States of America ("United States"), for the refund of Federal income taxes (including interest thereon) erroneously and illegally assessed and collected by the Internal Revenue Service ("IRS") from plaintiff for its taxable year ending December 31, 1979 ("Plaintiff's Refund Action"). In the alternative, plaintiff brings this action against defendant to recover a debt which defendant has acknowledged it owes to plaintiff with respect to its 1979 taxable year ("Plaintiff's Account Stated Action"). Finally, also in the alternative, plaintiff brings this action against defendant to recover statutory interest arising under sections 6611 and 6621(d) of the Internal Revenue Code of 1986 ("IRC") and section 3301(c) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-26 ("Restructuring Act"), with respect to plaintiff's overpayment of Federal income taxes for taxable year 1979 ("Plaintiff's Global Interest Netting Action").

At the present time, plaintiff is engaged in discussions with the IRS concerning the issues raised in this Complaint, and hopes to resolve these issues without the need for

judicial intervention. Plaintiff is filing the instant lawsuit now in order to protect its claims prior to the expiration of the relevant statute of limitations for filing this action.

In support of the three claims raised herein, plaintiff alleges the facts set forth below.

## PARTIES

1. Plaintiff, GE and Subsidiaries, is an affiliated group of corporations that filed a consolidated Federal income tax return for taxable year 1979. GE, the common parent of the affiliated group of corporations, is a corporation organized under the laws of the State of New York with a principal place of business located at 3135 Easton Turnpike, Fairfield, Connecticut 06431-0001. GE's employer identification number is 14-0689340.

2. Defendant is the United States. The United States is named as a party because the actions complained of herein were taken by defendant through its officials or agencies, including the IRS.

## JURISDICTION

A. Plaintiff's Refund Action

3. Plaintiff's Refund Action is a suit arising under IRC sections 6402(a), 6532, and 7422 for the refund of Federal income taxes (plus interest thereon) erroneously and illegally assessed and collected by the IRS from plaintiff for its taxable year ending December 31, 1979.

4. Jurisdiction over Plaintiff's Refund Action is conferred on this Court by virtue of 28 U.S.C. section 1346(a)(1).

B. Plaintiff's Account Stated Action

5. Plaintiff's Account Stated Action is a suit arising under 28 U.S.C. section 1491(a)(1), in that plaintiff's action is founded upon an express or implied contract arising from defendant's agreement to return to plaintiff the amount of its overpayment of Federal income taxes (plus interest thereon) for taxable year 1979.

6. Jurisdiction over Plaintiff's Account Stated Action is conferred on this Court by virtue of 28 U.S.C. section 1491(a)(1).

C. Plaintiff's Global Interest Netting Action

7. Plaintiff's Global Interest Netting Action is also a suit arising under 28 U.S.C. section 1491(a)(1), in that plaintiff's action is founded upon an Act of Congress (IRC sections 6402(a), 6611, and 6621(d)).

8. Jurisdiction over Plaintiff's Global Interest Netting Action is conferred on this Court by virtue of 28 U.S.C. section 1491(a)(1).

## STATUTORY BASIS FOR THE ACTIONS

### COUNT ONE
### Plaintiff's Refund Action

9. With respect to Plaintiff's Refund Action, plaintiff incorporates, as if fully written herein, the allegations contained in paragraphs 1 through 8 of this Complaint.

10. On or about September 8, 1980, plaintiff filed its consolidated Federal income tax return for taxable year 1979 (Form 1120) with the IRS Service Center at Andover, Massachusetts. The following name, address, and employer identification number appeared on the aforementioned return:

GENERAL ELECTRIC CO – ALBANY
1 RIVER RD
SCHENECTADY NY 12345
EIN 14-0689340

11. By the time plaintiff filed its above-noted return, it had already paid $383,804,609 in Federal income taxes for taxable year 1979.

12. On or about October 31, 1991, GE made an additional payment in the amount of $2,814,433 with respect to plaintiff's Federal income tax liability for taxable year 1979.

13. On or about April 2, 1992, the IRS mailed a statutory notice of deficiency under IRC section 6212 (Letter 901(RO)) to plaintiff concerning, *inter alia*, its 1979 taxable year.

14. On or about June 29, 1992, plaintiff timely filed a Petition with the United States Tax Court concerning, *inter alia,* its 1979 taxable year. The caption of the case was General Electric Company and Subsidiaries v. Commissioner, Docket No. 14715-92. In the Petition, the petitioner (i.e., plaintiff) asserted that, in addition to a redetermination of additional proposed deficiencies, it was entitled to a refund of income taxes for, *inter alia,* taxable year 1979.

15. On July 22, 1998, the Restructuring Act was signed into law. Section 3301(a) of the Restructuring Act added the so-called global interest netting rules to the Internal Revenue Code in IRC section 6621(d). IRC section 6621(d) provides in pertinent part as follows:

> To the extent that, for any period, interest is payable under subchapter A [IRC sections 6601-6602] and allowable under subchapter B [IRC sections 6611-6612] on equivalent underpayments and overpayments by the same taxpayer of tax imposed by this title, the net rate of interest under this section on such amounts shall be zero for such period.

16. Section 3301(b) of the Restructuring Act amended IRC section 6601(f) by adding a new sentence at the end thereof, described as a "conforming amendment." As amended by the Restructuring Act, IRC section 6601(f) provides as follows:

> No interest shall be imposed under this section on the portion of the tax so satisfied for any period during which, if the credit had not been made, interest would have been allowable with respect to such overpayment. <u>The preceding sentence shall not apply to the extent that section 6621(d) applies.</u> (Emphasis supplied.)

17. Section 3301(c)(2) of the Restructuring Act, as amended by section 4002(d) of the Tax and Trade Relief Extension Act of 1998, Pub. L. No. 105-277, provides that the zero net interest rate for equivalent overpayments and underpayments provided for in IRC section 6621(d) shall, in certain circumstances, be retroactive to periods before July 22, 1998, the date of enactment of the Restructuring Act. It states:

> (2) SPECIAL RULE.-Subject to any applicable statute of limitations not having expired with regard to either a tax underpayment or a tax overpayment, the amendments made by this section shall apply to interest for periods beginning before the date of enactment of this Act if the taxpayer—
>
> (A) reasonably identifies and establishes periods of such tax overpayments and underpayments for which the zero rate applies; and
>
> (B) not later than December 31, 1999, requests the Secretary of the Treasury to apply section 6621(d) of the Internal Revenue Code of 1986, as added by subsection (a), to such periods.

18. On or about September 17, 1999, the parties in the Tax Court case referred to in paragraph 14 above (<u>i.e.</u>, plaintiff and the IRS), mailed to the Tax Court an executed Stipulation and an agreed-upon Decision. The Stipulation and the Decision reflected that the petitioner in the case (<u>i.e.</u>, plaintiff) had overpaid its income taxes for, *inter alia,* taxable year 1979 in the amount of $37,170,101 (exclusive of interest). The Tax Court entered the

Decision on September 24, 1999. Copies of the Stipulation and the Decision are attached as Exhibits 1 and 2, respectively.

19. In September of 1999, GE and the IRS executed a Form 870-AD (Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment) concerning, *inter alia,* plaintiff's 1986 and 1987 taxable years. This agreement reflected that, subject to reservation as to certain unagreed issues, plaintiff was liable for deficiencies for taxable years 1986 and 1987 in the amounts of $70,617,583 and $401,813,144, respectively. A copy of this Form 870-AD is attached as Exhibit 3.

20. In October of 1999, certain cash bonds previously submitted to the IRS by plaintiff in 1987 and 1991 were converted into payments of tax and interest with respect to a portion of the asserted deficiencies for taxable years 1986 and 1987.

21. On or about December 21, 1999, plaintiff requested the IRS, by Form 843, to apply IRC section 6621(d) and Section 3301(c)(2) of the Restructuring Act to all of its periods where there were (or would be) equivalent overpayments and underpayments (including accrued interest thereon), such that the net rate of interest for such periods on such overpayments and underpayments would be zero ("Plaintiff's Global Interest Netting Claim"). A copy of Plaintiff's Global Interest Netting Claim is attached as Exhibit 4.

22. Plaintiff's Global Interest Netting Claim specifically identified the periods in which plaintiff's 1979 overpayment and 1986 and 1987 underpayments overlapped and requested that the IRS apply global interest netting with respect to its $37,170,101 overpayment for taxable year 1979 and its equivalent asserted deficiencies for taxable years 1986 and 1987 (including accrued interest thereon).

23. Plaintiff's Global Interest Netting Claim satisfied the requirements of Section 3301(c)(2) of the Restructuring Act, as interpreted by Rev. Proc. 99-43, 1999-2 C.B. 579. Accordingly, plaintiff was entitled to the net interest rate of zero for equivalent overpayments and underpayments under IRC section 6621(d) for certain periods prior to July 22, 1998.

24. When the IRS began computing statutory interest for plaintiff's 1979 year and deficiency interest for plaintiff's 1986-1987 years, interest was payable under IRC section 6601 with respect to plaintiff's 1986 and 1987 underpayment years, and interest was also allowable under IRC section 6611 with respect to plaintiff's 1979 overpayment year on equivalent underpayment and overpayment amounts by the same taxpayer (i.e., plaintiff) for overlapping periods. *See generally* Plaintiff's Global Interest Netting Claim (Exhibit 4). Moreover, plaintiff had followed all of the statutory and procedural requirements for having the global interest netting rules applied to periods prior to July 22, 1998. Accordingly, when computing interest for plaintiff's 1979 and 1986-1987 years, the global interest netting rules of IRC sections 6601(f) and 6621(d) and Section 3301(c)(2) of the Restructuring Act required the IRS to use a net interest rate of zero on such equivalent overpayment and underpayment amounts for the overlapping periods of time.

25. The interest computations prepared by the IRS concerning plaintiff's 1979 and 1986-1987 years were finalized during July 2000. In these computations, the IRS failed to apply the global interest netting rules of IRC sections 6601(f) and 6621(d) and Section 3301(c)(2) of the Restructuring Act. Instead, as described below in paragraph 27,

the IRS purported to credit plaintiff's overpayment for taxable year 1979 (together with interest) against portions of the asserted deficiencies for taxable years 1986 and 1987.

26. On or about August 14, 2000, the IRS took the following actions with respect to plaintiff's 1979 taxable year: (i) it abated a $37,170,101 tax assessment; and (ii) it abated a $3,772,301 deficiency interest assessment.

27. Also on or about August 14, 2000, notwithstanding Plaintiff's Global Interest Netting Claim, the IRS purported to credit (offset), pursuant to IRC section 6402(a), plaintiff's agreed-to $37,170,101 overpayment for 1979, plus the $3,772,301 abatement of interest amount, plus $43,993,361 of accrued statutory interest for taxable year 1979 against portions of the asserted deficiencies for plaintiff's 1986 and 1987 years, as shown below:

(i) $32,267,222 was applied to plaintiff's 1986 year; and

(ii) $52,668,541 was applied to plaintiff's 1987 year.

28. The IRS's purported crediting of plaintiff's overpayment for taxable year 1979 (together with interest) against portions of the asserted deficiencies for taxable years 1986 and 1987 reduced the amount of global interest netting available to plaintiff.

29. The IRS's purported crediting of plaintiff's overpayment for taxable year 1979 (together with interest) against portions of the asserted deficiencies for taxable years 1986 and 1987, was prohibited by IRC sections 6601(f) and 6621(d) and consequently was null, void, and ineffective.

30. Several years after the IRS's purported crediting of plaintiff's overpayment for taxable year 1979 (together with interest) against portions of the asserted deficiencies for taxable years 1986 and 1987, plaintiff's 1986 and 1987 taxable years evolved into

overpayment years as a result of plaintiff's prevailing on certain of the unagreed issues referred to in paragraph 19.

31. Because the amount of global interest netting available to plaintiff had been reduced by the IRS's purported crediting of plaintiff's overpayment for taxable year 1979 (together with interest) against portions of the asserted deficiencies for taxable years 1986 and 1987, plaintiff is unable to fully utilize the cash bonds that were converted and applied to the asserted deficiencies for its 1986 and 1987 taxable years.

32. The Tax Court Petition identified in paragraph 14 above constituted a refund claim within the meaning of IRC sections 6511(a) and 7422(a) for plaintiff's 1979 taxable year. Further, pursuant to IRC section 6511(c), this refund claim was timely filed with the Albany District Counsel Office of the IRS no later than July of 1992. This refund claim listed plaintiff as the taxpayer and stated that GE's principal office was at 3135 Easton Turnpike, Fairfield, Connecticut 06431. A copy of this refund claim is attached hereto as Exhibit 5 and its allegations are incorporated herein by reference.

33. The IRS never mailed to plaintiff by certified or registered mail a notice of disallowance concerning the refund claim identified in paragraph 32 above.

34. The Stipulation and/or the Decision identified in paragraph 18 above also constituted refund claims within the meaning of IRC sections 6511(a) and 7422(a) for plaintiff's 1979 taxable year. Further, pursuant to IRC section 6511(c), these refund claims were timely filed with the Albany District Counsel Office of the IRS in September of 1999. These refund claims listed plaintiff as the taxpayer. Copies of these refund claims are attached hereto as Exhibits 1 and 2 and their contents are incorporated herein by reference.

35. The IRS never mailed to plaintiff by certified or registered mail a notice of disallowance concerning the refund claims identified in paragraph 34 above.

36. IRC section 6512(a)(1) authorizes plaintiff to file this action to recover the amount of the overpayment (plus interest thereon) determined by the final Decision of the Tax Court with respect to plaintiff's 1979 taxable year.

37. This Complaint -- as it pertains to Plaintiff's Refund Action -- is timely filed pursuant to IRC sections 6532(a) and 7422, because (i) plaintiff timely filed refund claims concerning its overpayment for 1979, (ii) the IRS never mailed to plaintiff by certified mail or registered mail a notice of disallowance concerning any of these refund claims, and (iii) this Complaint is being filed more than 6 months after plaintiff's refund claims were filed.

38. Based upon paragraphs 9-37 above, plaintiff is entitled to a refund of income taxes for its taxable year 1979 in the amount of $37,170,101, or such other or greater amount as is, or may be found to be, legally refundable, plus interest as provided by law (including the $3,772,301 of the deficiency interest assessment for 1979 that was abated by the IRS), no part of which has been repaid or properly credited to another taxable year.

39. Plaintiff has made no transfer or assignment of this claim herein presented or any part thereof, and is the sole and absolute owner of the claim.

40. No action on Plaintiff's Refund Action has been taken by the Congress or any of the departments of the United States, other than the actions of the IRS and the United States Tax Court as described in this Complaint. No other suit or process by plaintiff, or any assignee, is currently pending on such action in any court, including the United States Tax Court.

41. All conditions precedent to the bringing of this action have been performed or have occurred.

COUNT TWO
Plaintiff's Account Stated Action

42. With respect to Plaintiff's Account Stated Action, plaintiff incorporates, as if fully written herein, the allegations contained in paragraphs 1 through 41 of this Complaint.

43. In the Stipulation and/or the Decision (each of which are identified in paragraph 18 above and attached at Exhibits 1 and 2, respectively) and/or as a result of the abatements identified in paragraph 26 above, the IRS acknowledged that it was indebted to plaintiff in the amount of $37,170,101 (exclusive of interest) arising from plaintiff's overpayment of Federal income taxes for taxable year 1979. Accordingly, there was an express or an implied-in-fact contract between plaintiff and defendant for the return of the $37,170,101 amount, together with interest thereon.

44. Defendant has breached its contract with plaintiff by illegally purporting to credit plaintiff's $37,170,101 overpayment for 1979 (together with interest) against portions of the unpaid deficiencies asserted by the IRS for plaintiff's' 1986 and 1987 taxable years, which crediting was prohibited by IRC sections 6601(f) and 6621(d) -- i.e., if IRC section 6621(d) is applicable, it precludes the application of IRC section 6402(a).

45. As a direct and proximate result of this breach, plaintiff has suffered and continues to suffer damages in the amount of $37,170,101, plus interest as provided for by law.

46. The Supreme Court has held that a taxpayer may file an account stated action in order to recover the amount of an overpayment determined by the Tax Court. Bonwit

Teller & Company v. United States, 283 U.S. 258 (1931). *See also* IRC section 6512(a)(1) (a taxpayer may file suit to recover an overpayment determined by a final Tax Court Decision).

47. This Complaint -- as it pertains to Plaintiff's Account Stated Action -- is timely filed pursuant to 28 U.S.C. sections 2401 and 2501(a), because it is being filed within six years after such claim first accrued.

48. Plaintiff has made no transfer or assignment of this claim herein presented or any part thereof, and is the sole and absolute owner of the claim.

49. No action on Plaintiff's Account Stated Action has been taken by the Congress or any of the departments of the United States, other then the actions of the IRS and the United States Tax Court as described in this Complaint. No other suit or process by plaintiff, or any assignee, is currently pending on such action in any court, including the United States Tax Court.

50. All conditions precedent to the bringing of this action have been performed or have occurred.

COUNT THREE
Plaintiff's Global Interest Netting Action

51. With respect to Plaintiff's Global Interest Netting Action, plaintiff incorporates, as if fully written herein, the allegations contained in paragraphs 1 through 50 of this Complaint.

52. Plaintiff's Global Interest Netting Action is founded upon IRC sections 6601(f) and 6621(d) and Section 3301(c) of the Restructuring Act.

53. With respect to plaintiff's 1979 and 1986 taxable years, plaintiff is entitled to the zero net interest rate provided for in IRC section 6621(d) for the period between March

15, 1987 and February 22, 1991 (the "1979/1986 Overlap Period"), because, during this period of time, plaintiff had interest allowable and interest payable during such period on an equivalent underpayment and overpayment amount (the $32,267,222 amount referred to in paragraph 27 of this Complaint that the IRS purported to credit from plaintiff's 1979 year to its 1986 year) within the meaning of IRC section 6621(d). Further, Plaintiff's Global Interest Netting Claim complied with the provisions of section 3301(c)(2) of the Restructuring Act for the retroactive application of IRC section 6621(d) to such period.

54. As a consequence of the purported crediting by the IRS referred to in paragraph 27, plaintiff was denied overpayment interest which would have accrued on the $32,267,222 amount during the 1979/1986 Overlap Period. (Pursuant to IRC section 6621(d), such amount would have been offset by an equal amount of underpayment interest accruing during the 1979/1986 Overlap Period with respect to plaintiff's 1986 taxable year.) Such $32,267,222 amount continues to accrue interest from the conclusion of the 1979/1986 Overlap Period until payment has been made to plaintiff or the amount is properly credited to another tax year.

55. With respect to plaintiff's 1979 and 1987 taxable years, plaintiff is entitled to the zero net interest rate provided for in IRC section 6621(d) for the period between March 15, 1988 and February 22, 1991 (the "1979/1987 Overlap Period"), because, during this period of time, plaintiff had interest allowable and interest payable during such period on an equivalent underpayment and overpayment amount (the $52,668,541 amount referred to in paragraph 27 of this Complaint that the IRS purported to credit from plaintiff's 1979 year to its 1987 year) within the meaning of IRC section 6621(d). Further, plaintiff has complied

with the provisions of section 3301(c)(2) of the Restructuring Act for the retroactive application of IRC section 6621(d) to such period.

56. As a consequence of the purported crediting by the IRS referred to in paragraph 27, plaintiff was denied overpayment interest which would have accrued on the $52,668,541 amount during the 1979/1987 Overlap Period. (Pursuant to IRC section 6621(d), such amount would have been offset by an equal amount of underpayment interest accruing during the 1979/1987 Overlap Period with respect to plaintiff's 1987 taxable year.) Such $52,668,541 amount continues to accrue interest from the conclusion of the 1979/1987 Overlap Period until payment has been made to plaintiff or the amount is properly credited to another tax year.

57. This Complaint -- as it pertains to Plaintiff's Global Interest Netting Action -- is timely filed pursuant to 28 U.S.C. sections 2401 and 2501(a), because it is being filed within six years after such claim first accrued.

58. Plaintiff has made no transfer or assignment of this claim herein presented or any part thereof, and is the sole and absolute owner of the claim.

59. No action on Plaintiff's Global Interest Netting Action has been taken by the Congress or any of the departments of the United States. No other suit or process by plaintiff, or any assignee, is currently pending on such action in any court, including the United States Tax Court.

60. All conditions precedent to the bringing of this action have been performed or have occurred.

WHEREFORE, plaintiff, General Electric Company and Subsidiaries, prays the Court for relief as follows:

(1) that, pursuant to Count One, judgment be entered in plaintiff's favor against defendant, the United States, in the amount of $37,170,101, or such other amount as may be legally refundable, plus interest as provided for by law;

(2) that, pursuant to Count Two, judgment be entered in plaintiff's favor against defendant, the United States, in the amount of $37,170,101, or such other amount as may be legally refundable, plus interest as provided for by law; or

(3) that, pursuant to Count Three, judgment be entered in plaintiff's favor against defendant, the United States, in the amount of $37,170,101, or such other amount as may be legally refundable, plus interest as provided for by law; and

(4) for such other and further relief as this Court deems appropriate.

Dated: June 30, 2006

Respectfully submitted,

Patricia M. Lacey

PATRICIA M. LACEY
Attorney of Record for Plaintiff
General Electric Company and Subsidiaries

GE Corporate Taxes
12 Corporate Woods Blvd., 3rd Fl.
Albany, NY 12211
(518) 433-4359

Of Counsel:

James V. Heffernan
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004-2415
(202) 383-0141

**UNITED STATES TAX COURT**

| | |
|---|---|
| GENERAL ELECTRIC COMPANY AND SUBSIDIARIES, | ) |
| | ) |
| Petitioner, | ) |
| | ) Docket No. 14715-92 |
| v. | ) Judge Cohen |
| | ) |
| COMMISSIONER OF INTERNAL REVENUE, | ) |
| | ) |
| Respondent. | ) |

**REVISED STIPULATION**

It is hereby stipulated that the following statement is a calculation of General Electric Company and Subsidiaries' ("GE's") Federal income tax liability for the taxable years 1979 and 1980 as a result of the opinion of the Court filed July 13, 1995, in General Electric Company and Subsidiaries v. Commissioner, T.C. Memo 1995-306 ("the GE Case") and the settlement of other issues by the parties:

**1979**

| | | |
|---|---|---|
| Tax liability, before allowance for tax credit carrybacks from 1981 and 1982 to 1979 | | $325,988,785 |
| Net tax assessed and paid, before allowance for tax credit carrybacks from 1981 and 1982 to 1979 | | $380,574,515 |
| Payments: | | |
| March 15, 1980 (overpayment credit) | $ 16,442,866 | |
| March 15, 1980 (statutory date) | 337,506,566 | |
| March 15, 1980 (fuel credit) | 266,290 | |
| March 15, 1980 (business energy credit) | 2,362 | |
| June 16, 1980 | 29,586,525 | |
| October 31, 1991 | 2,814,433 | |
| Total Payments | $386,619,042 | |
| Less Allowances, before allowance for tax credit carrybacks from 1981 and 1982 to 1979: March 15, 1980 (overpayment credited to 1980) | $ 6,044,527 | |
| Net payment | $380,574,515 | |

| | | |
|---|---|---|
| Overpayment, before allowance for tax credit carrybacks from 1981 and 1982 to 1979 | | $ 54,585,730 |
| Tax liability, after allowance for tax credit carrybacks from 1981 to 1979 | | $296,008,935 |
| Net tax assessed and paid, after allowance for tax credit carrybacks from 1981 to 1979 | | $313,341,958 |
| Payments: | | |
| March 15, 1980 (overpayment credit) | $ 16,442,866 | |
| March 15, 1980 (statutory date) | 337,506,566 | |
| March 15, 1980 (fuel credit) | 266,290 | |
| March 15, 1980 (business energy credit) | 2,362 | |
| June 16, 1980 | 29,586,525 | |
| October 31, 1991 | 2,814,433 | |
| Total Payments | $386,619,042 | |
| Less Allowances, after allowance for tax credit carrybacks from 1981 to 1979: | | |
| March 15, 1980 (overpayment credited to 1980) | $ 6,044,527 | |
| June 30, 1982 | 67,232,557 | |
| Net payment | $313,341,958 | |
| Overpayment, after allowance for tax credit carrybacks from 1981 to 1979 | | $ 17,333,023 |
| Tax liability, after allowance for tax credit carrybacks from 1981 and 1982 to 1979 | | $188,401,027 |
| Net tax assessed and paid, after allowance for tax credit carrybacks from 1981and 1982 to 1979 | | $225,571,128 |
| Payments: | | |
| March 15, 1980 (overpayment credit) | $ 16,442,866 | |
| March 15, 1980 (statutory date) | 337,506,566 | |
| March 15, 1980 (fuel credit) | 266,290 | |
| March 15, 1980 (business energy credit) | 2,362 | |
| June 16, 1980 | 29,586,525 | |
| October 31, 1991 | 2,814,433 | |
| Total Payments | $386,619,042 | |

| | | |
|---|---|---|
| Less Allowances, after allowance for tax credit carrybacks from 1981 and 1982 to 1979: | | |
| March 15, 1980 (overpayment credited to 1980) | $ 6,044,527 | |
| June 30, 1982 | 67,232,557 | |
| June 22, 1983 | 87,770,830 | |
| Net payment | $225,571,128 | |
| Overpayment, after allowance for tax credit carrybacks from 1981 and 1982 to 1979 | | $ 37,170,101 |

I.R.C. §§ 6512(b)(3)(B) and 6511(c)(2)
1979 return filed November 10, 1980
Agreements for 1979 executed March 14, 1983, February 3, 1984, February 8, 1985, January 16, 1986, September 15, 1986, January 22, 1987, March 15, 1988, March 16, 1989, August 30, 1989, April 26, 1990, December 3, 1990, and September 17, 1991 (Extending statutory period to June 30, 1992)
Deficiency notice for 1979 mailed April 2, 1992

**1980**

| | | |
|---|---|---|
| Tax liability, before allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980 | | $355,566,611 |
| Net tax assessed and paid, before allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980 | | $359,831,780 |
| Payments: | | |
| March 15, 1981 (overpayment credit) | $ 6,044,529 | |
| March 15, 1981 (statutory date) | 290,300,236 | |
| March 15, 1981 (fuel credit) | 238,515 | |
| June 16, 1980 | 39,708,962 | |
| October 31, 1991 | 32,070,991 | |
| Total Payments | $368,363,233 | |

| | | |
|---|---|---|
| Less Allowances, before allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980: | | |
| February 1, 1984 | 6,636,678 | |
| November 2, 1984 | 1,894,775 | |
| Net payment | $359,831,780 | |
| Overpayment, before allowance for tax credit carrybacks from 1981,1982 and 1983 to 1979 | | $ 4,265,169 |
| Tax liability, after allowance for tax credit carrybacks from 1981 to 1980 | | $342,011,920 |
| Net tax assessed and paid, after allowance for tax credit carrybacks from 1981 to 1980 | | 359,831,780 |
| Payments: | | |
| March 15, 1981 (overpayment credit) | $ 6,044,529 | |
| March 15, 1981 (statutory date) | 290,300,236 | |
| March 15, 1981 (fuel credit) | 238,515 | |
| June 16, 1980 | 39,708,962 | |
| October 31, 1991 | 32,070,991 | |
| Total Payments | $368,363,233 | |
| Less Allowances, after allowance for tax credit carrybacks from 1981 to 1980: | | |
| February 1, 1984 | 6,636,678 | |
| November 2, 1984 | 1,894,775 | |
| Net payment | $359,831,780 | |
| Overpayment, after allowance for tax credit carrybacks from 1981 to 1980 | | $ 17,819,860 |
| Tax liability, after allowance for tax credit carrybacks from 1981 and 1982 to 1980 | | $298,521,984 |
| Net tax assessed and paid, after allowance for tax credit carrybacks from 1981 and 1982 to 1980 | | $295,458,744 |

| | | |
|---|---|---|
| Payments: | | |
| March 15, 1981 (overpayment credit) | $ 6,044,529 | |
| March 15, 1981 (statutory date) | 290,300,236 | |
| March 15, 1981 (fuel credit) | 238,515 | |
| June 16, 1980 | 39,708,962 | |
| October 31, 1991 | 32,070,991 | |
| Total Payments | $368,363,233 | |
| Less Allowances, after allowance for tax credit carrybacks from 1981 and 1982 to 1980: | | |
| February 1, 1984 | 6,636,678 | |
| June 22, 1983 | 64,373,036 | |
| November 2, 1984 | 1,894,775 | |
| Net payment | $295,458,744 | |
| Deficiency, after allowance for tax credit carrybacks from 1981 and 1982 to 1980 (to be assessed) | | $ 3,063,240 |
| Tax liability, after allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980 | | $ 99,589,330 |
| Net tax assessed and paid, after allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980 | | $151,786,384 |
| Payments: | | |
| March 15, 1981 (overpayment credit) | $ 6,044,529 | |
| March 15, 1981 (statutory date) | 290,300,236 | |
| March 15, 1981 (fuel credit) | 238,515 | |
| June 16, 1980 | 39,708,962 | |
| October 31, 1991 | 32,070,991 | |
| Total Payments | $368,363,233 | |

| | | |
|---|---|---|
| Less Allowances, after allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980: | | |
| February 1, 1984 | 6,636,678 | |
| June 22, 1983 | 64,373,036 | |
| May 31, 1984 | 143,672,360 | |
| November 2, 1984 | 1,894,775 | |
| Net payment | $151,786,384 | |
| Overpayment, after allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980 | | $ 52,197,054 |

I.R.C. §§ 6512(b)(3)(B) and 6511(c)(2)
1980 return filed October 19, 1981
Agreements for 1980 executed February 3, 1984, February 8, 1985, January 16, 1986, September 15, 1986, January 22, 1987, March 15, 1988, March 16, 1989, August 30, 1989, April 26, 1990, December 3, 1990, and September 17, 1991 (Extending statutory period to June 30, 1992)
Deficiency notice for 1980 mailed April 2, 1992

It is further stipulated that, if, subsequent to the date this stipulation is signed by the parties: (i) GE's consolidated taxable income for 1983 is reduced, either by settlement with the Internal Revenue Service and/or the United States Department of Justice or by the final decision of a court with jurisdiction over GE's 1983 taxable year; and (ii) the aforementioned reduction in taxable income frees up additional tax credits for 1983 that are available to carry back to GE's 1980 taxable year, then, within the time permitted by I.R.C. § 6511(d)(4)(A), GE may carry back such credits to taxable year 1980 and claim an additional refund for 1980.

Nothing in this stipulation, which is entered into solely to compute GE's Federal income tax liability for the taxable years 1979 and 1980 as a result of the opinion of the Court in the GE Case and the settlement of other issues, shall preclude GE from filing an appeal, nor is this stipulation intended as a waiver of GE's right to file an appeal, from any decision entered in this case insofar as it pertains to the issue that was the subject of the Court's opinion in the GE Case.

It is further stipulated that, effective upon the entry of a decision in this case by the Court, GE waives the restriction contained in I.R.C. § 6213(a) prohibiting assessment and collection of the deficiency (plus statutory interest) until the decision of the Tax Court has become final.

STUART L. BROWN
Chief Counsel
Internal Revenue Service

Patricia M. Lacey

PATRICIA M. LACEY
General Electric Company
12 Corporate Woods Blvd., 3d Fl.
Albany, New York 12211
(518) 433-4359
Tax Court No. LP0216
Counsel for Petitioner

Dated: September 14, 1999

By: Lewis R. Mandel

LEWIS R. MANDEL
Special Trial Attorney
Northeast Region
1600 Stewart Avenue, Suite 601
Westbury, New York 11590
(516) 688-1707
Tax Court No. ML0032

Dated: September 17, 1999

**UNITED STATES TAX COURT**

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY AND SUBSIDIARIES, | ) | |
| Petitioner, | ) | Docket No. 14715-92 |
| v. | ) | Judge Cohen |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| Respondent. | ) | |

**DECISION**

Pursuant to the Revised Stipulation of the parties filed in this case, and incorporating herein the facts stipulated by the parties as the findings of the Court, it is

ORDERED and DECIDED: That there is an overpayment in General Electric Company and Subsidiaries' ("GE's") income tax for taxable year 1979 in the amount of $37,170,101, after allowance for tax credit carrybacks from 1981 and 1982 to 1979, which amount was collectively paid on October 31, 1991, June 16, 1980 and March 15, 1980 and for which amount a claim for refund could have been filed, under the provisions of I.R.C. § 6511(c)(2), on April 2, 1992, the date of the mailing of the notice of deficiency; and

That there is an overpayment in GE's income tax for taxable year 1980 in the amount of $52,197,054, after allowance for tax credit carrybacks from 1981, 1982 and 1983 to 1980, which amount was collectively paid on October 31, 1991 and June 16, 1980 and for which amount a claim for refund could have been filed; under the provisions of I.R.C. § 6511(c)(2), on April 2, 1992, the date of the mailing of the notice of deficiency.

(Signed) Mary Ann Cohen

Judge.

Entered: SEP 24 1999

* * * * *

It is hereby stipulated that the Court may enter the foregoing decision in this case in accordance with the Revised Stipulation of the parties submitted herewith.

STUART L. BROWN
Chief Counsel
Internal Revenue Service

Patricia M. Lacey

PATRICIA M. LACEY
General Electric Company
12 Corporate Woods Blvd., 3d Fl.
Albany, New York 12211
(518) 433-4359
Tax Court No. LP0216
Counsel for Petitioner

Dated: September 16, 1999

By: Lewis R. Mandel

LEWIS R. MANDEL
Special Trial Attorney
Northeast Region
1600 Stewart Avenue, Suite 601
Westbury, New York 11590
(516) 688-1707
Tax Court No. ML0032

Dated: September 17, 1999

Department of the Treasury-Internal Revenue Service

**Form 870-AD**
(rev. 04/1992)

# Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment

| Symbols: | Name of Taxpayer: | SSN or EIN: |
|---|---|---|
| NE:CTRI:AP:RTB | GENERAL ELECTRIC COMPANY | 14-0689340 |

Under the provisions of section 6213(d) of the Internal Revenue code of 1986 (the Code), or corresponding provisions of prior internal revenue laws, the undersigned offers to waive the restrictions provided in section 6213(a) of the Code or corresponding provisions of prior internal revenue laws, and to consent to the assessment and collection of the following deficiencies and additions to tax, if any, with interest as provided by law. The undersigned offers also to accept the following overassessments, if any, as correct. Any waiver or acceptance of an overassessment is subject to any terms and conditions stated below and on the reverse side of this form.

**Deficiencies (Overassessments) and Additions to Tax**

| Year Ended | Kind of Tax | Tax | | | | |
|---|---|---|---|---|---|---|
| December 31, 1983 | Income | $( 29,395,004) | | | | |
| December 31, 1984 | Income | $( 73,243,075) | | | | |
| December 31, 1985 | Income | $( 18,851,083) | | | | |
| December 31, 1986 | Income | $ 70,617,583 | | | | |
| December 31, 1987 | Income | $ 401,813,144 | | | | |
| | | | | | | |

INTERNAL REVENUE SERVICE RECEIVED
99 OCT 22 AM 10: 06
APPEALS OFFICE HARTFORD, CT

This offer must be accepted for the Commissioner of Internal Revenue and will take effect on the date it is accepted. Unless and until it is accepted, it will have no force or effect.

If this offer is accepted, the Agreed Items (identified below) will not be reopened by the Commissioner unless there was:

- *fraud, malfeasance, concealment or misrepresentation of a material fact*
- *an important mistake in mathematical calculation*
- *a deficiency or overassessment resulting from adjustments made under Subchapters C and D of Chapter 63 concerning the tax treatment of partnership and subchapter S items determined at the partnership and corporate level*
- *an excessive tentative allowance of a carryback provided by law*

No claim for refund or credit will be filed or prosecuted by the taxpayer with respect to the Agreed Items for the years stated on this form, other than for amounts attributed to carrybacks provided by law.

The proper filing of this offer, when accepted, will expedite assessment and billing (or overassessment, credit or refund) by adjusting the tax liability. This offer, when executed and timely submitted, will be considered a claim for refund for the above overassessment(s), if any.

| | | |
|---|---|---|
| Signature of Taxpayer: | | Date: |
| Signature of Taxpayer: | | Date: |
| Signature of Taxpayer's Representative: | | Date: |
| Corporate Name: GENERAL ELECTRIC COMPANY | | Date: |
| By Corporate Officer: [signature] | Title: Vice President | Date: 10/6/99 |

| For Internal Revenue Use Only | Date Accepted for Commissioner: 10/22/99 | Signature: [signature] Richard J. Barthel |
|---|---|---|
| | Office: Connecticut-Rhode Island Appeals | Title: TEAM CHIEF |

(See second page for signature instructions)

General Electric v. US
Complaint Exhibit 3

This offer may be executed by the taxpayer's attorney, certified public accountant, or agent provided this is specifically authorized by a power of attorney which, if not previously filed, must accompany this form. If this offer is signed by a person acting in a fiduciary capacity (for example: an executor, administrator, or a trustee) Form 56, Notice Concerning Fiduciary Relationship, must accompany this form, unless previously filed.

If this offer is executed for a year for which a joint return was filed, it must be signed by both spouses unless one spouse, acting under a power of attorney, signs as agent for the other.

If this offer is executed by a corporation, it must be signed with the corporate name followed by the signature and titl of the officer(s) authorized to sign. If the offer is accepted, as a condition of acceptance, any signature by or for a corporate officer will be considered a representation by that person and the corporation, to induce reliance, that such signature is binding under law for the corporation to be assessed the deficiencies or receive credit or refund under this agreement. If the corporation later contests the signature as being unauthorized on its behalf, the person who signed may be subject to criminal penalties for representing that he or she had authority to sign this agreement on behalf of the corporation.

This agreement covers only those items which have been agreed-to by the parties to date (the "Agreed Items"). Except for the items set forth in Joint Exhibit B, the Agreed Items consist of the resolution of all adjustments that were proposed in the Revenue Agent's Reports ("RAR") (Letter 950) for General Electric Company and subsidiaries' ("GE's") 1983-1984 and 1985-1987 taxable years (including RAR adjustments which were ultimately agreed-to at the Appellate level), as well as certain items that were raised for the first time (by GE) during Appeals' consideration of GE's 1983-1984 and 1985-1987 taxable years.

Joint Exhibit A lists the Agreed Items that were raised by GE for the first time during Appeals' consideration o GE's 1983-1984 and 1985-1987 taxable years. Joint Exhibit B lists items that the parties have not agreed to to date. The taxpayer reserves the right to make additional claims for refund or credit with respect to unagreed items, including the unagreed items that are identified in Joint Exhibit B(1). Appeals reserves the right to issue a statutory notice to GE h respect to unagreed items, including the unagreed items that are identified in Joint Exhibit B(2).

**JOINT EXHIBIT A**
**(AGREED ITEMS RAISED IN APPEALS)**

1. GE has claimed that it is entitled to offset (reduce) its investment tax credit ("ITC") recapture tax liability for taxable years 1983-1987 with excess ITC from its 1981-1983 and 1985 taxable years.

2. GE has claimed that it is entitled to offset (reduce) its minimum tax liability for taxable years 1983-1985 with excess ITC from its 1983 and 1985 taxable years.

3. GE has claimed that it is entitled to reduce its taxable income for taxable years 1986 and 1987, relating to certain payments it received from Meel Baharain, a foreign subsidiary.

4. GE has claimed that it is entitled to deduct an additional capital loss for taxable year 1986, relating to its sale of the stock of SICE.

5. GE has determined that it must increase its taxable income for 1986, relating to a refund of an Advance Corporation Tax it received during 1992.

6. GE has claimed that it is entitled to reduce its taxable income for taxable year 1987, relating to an overpaid royalty that GE was required to repay to GE Canada

7. GE has claimed that it is entitled to additional ITC for taxable year 1987, and must also reduce its depreciation deduction for that year, relating to a cogeneration facility that the Internal Revenue Service determined was placed in service during 1987, not 1989.

GE has claimed that it is entitled to additional DISC and FSC commission deductions for taxable years 1983-1987, relating to regroupings of its DISC and FSC product lines.

9. GE has claimed that it is entitled to additional foreign tax credits ("FTC") for taxable year 1987, and may also reduce its taxable income for that year, relating to DASTM adjustments.

10. GE has claimed that it is entitled to additional I.R.C. § 29 tax credits for taxable years 1984-1987, relating to Ladd Petroleum Corporation ("Ladd").

11. GE has claimed that it is entitled to additional research tax credits for taxable years 1983-1987, relating to (i) fixed-price contracts and (ii) IR&D and B&P costs.

12. GE has claimed that it is entitled to reduce its taxable income for taxable year 1987, relating to a consolidated return adjustment for GE Technical Services Company, Inc.

13. GE has claimed that it is entitled to additional FTC for taxable years 1983-1987, relating to payments it made to Saudi Arabia.

14. GE has claimed that it is entitled to additional deductions for taxable years 1986-1987, relating to merger costs incurred by RCA Corporation ("RCA").

15. GE has claimed that it is entitled to additional deductions for taxable years 1983-1987, relating to Ladd.

16. GE has claimed that it is entitled to reduce its taxable income for taxable years 1986-1987, relating to certain Fixed Rate Transponder Tariffs that RCA American Communications entered into during 1982.

17. GE has claimed that it is entitled to additional I.R.C. § 174 deductions for taxable years 1983-1987, relating to contract engineering costs and expenses.

**JOINT EXHIBIT B**
**(UNAGREED ITEMS)**

(1) Unagreed Items that GE Reserves the Right to File Refund Claims For

1. Whether GE is entitled to claim additional separate return limitation year ("SRLY") ITC for taxable years 1985-1987, relating to Decimus Corporation.

2. Whether GE is entitled to claim SRLY net operating losses for taxable year 1984, relating to GE Minerals, Inc., Southern Sphere Holdings, Ltd. and Utah Pacific, Inc.

3. Whether GE is entitled to allocate its net interest expense (as opposed to its gross interest expense) between U.S. and foreign source income, for purposes of computing its FTC limitation for taxable years 1983-1987.

4. Whether GE is entitled to allocate its net interest expense (as opposed to its gross interest expense) between domestic and export sales, for purposes of computing its DISC and FSC commissions for taxable years 1983-1987.

5. Whether the so called no-loss rule (Treas. Reg. § 1.994-1(e)(1) and Treas. Reg. § 1.925-1(e)(1)) are valid DISC and FSC regulations; for purposes of computing GE's DISC and FSC commissions for taxable years 1983-1987.

6. Whether GE is required to allocate any of its research and development ("R&D") expenses relating to unsuccessful R&D projects to DISC and FSC combined taxable income ("CTI"), for purposes of computing GE's DISC and FSC commissions for taxable years 1983-1987.

7. In light of the 1982 R&D moratorium, whether GE is required to allocate any of its total R&D expenses to DISC and FSC CTI, for purposes of computing GE's DISC and FSC commissions for taxable years 1983-1985.

8. Whether GE is entitled to claim additional DISC and FSC commissions for taxable years 1983-1987, arising from its sales of aircraft engines and thrust reversers for direct use, consumption, or disposition outside the United States.

9. In light of the refund claims that GE has filed for RCA's 1984-1986 taxable years, whether GE is entitled to claim additional tax credit carryforwards from RCA's 1984-1986 taxable years to GE's 1986 taxable year.

10. Whether GE is entitled to deduct interest relating to uncontested tax deficiencies in the years such interest economically accrued. This item affects GE's 1983-1987 taxable years.

11. Whether GE is entitled to claim additional ITC for taxable years 1985-1987, pursuant to any transition rules for claiming ITC or due to the omission on the return(s) of otherwise qualifying items.

12. Whether GE is entitled to claim additional FTC (and must include the related I.R.C. § 78 gross-up in income) for taxable year 1987, relating to RCA Audio-Visuals Ltd.

13. Whether GE is entitled to claim additional FTC (and must include the related I.R.C. § 78 gross-up in income) for taxable year 1987, relating to Westdeutsche Quarzschmelze, GMBH.

14. Whether GE is entitled to claim additional FTC (and must include the related I.R.C. § 78 gross-up in income) for taxable year 1987, relating to GE Canada.

15. Whether GE is required to reduce its FTC (and the related I.R.C. § 78 gross-up) for taxable year 1987, relating to IGE(USA) Ltd.

16. Whether GE is entitled to reduce its dividend income for taxable years 1984-1985, relating to the recalculation of interest on deep discount loans issued by General Electric Credit Corporation ("GECC").

17. Whether GE is entitled to claim additional deductions for taxable years 1986-1987, relating to professional fees incurred by GECC.

18. Whether GE is entitled to claim additional deductions for taxable years 1985-1987, relating to G&A costs incurred by GE Rail Car Services Corporation.

19. The parties have settled various FSC issues for taxable years 1985-1987, and the IRS has reserved the right t issue a statutory notice for other FSC issues. See Items 1 and 2, below. After the final resolution of Items 1 and 2, below (whether by trial or otherwise), the parties may prepare a final computation of the GE FSC's ta: liability for taxable years 1985-1987. GE reserves the right to file refund claims for additional FSC commissi deductions for taxable years 1985-1987, in case the final computation of the GE FSC's tax liability for taxabl years 1985-1987 results in GE being entitled to increased FSC commission deductions for those years.

20. Whether GE is entitled to claim additional deductions under I.R.C. § 404(k) for taxable years 1985-1987, relating to certain ESOP stock redemptions that GE made during those years, which redemptions may have qualified as stock dividends under I.R.C. § 302(d).

21. Whether GE is entitled to invoke the global interest netting rules under I.R.C. § 6621(d), with respect to its 1983-1987 taxable years.

(2) Unagreed Items that the IRS Reserves the Right to Issue a Statutory Notice For

1. Whether GE properly claimed FSC commissions for taxable years 1986-1987, arising from its sales of aircraft engines and thrust reversers for direct use, consumption, or disposition outside the United States.

2. Whether GE properly claimed FSC commissions for taxable years 1985-1987, arising from its sales of aircraft engines and thrust reverser Spare Parts and/or modules, for direct use, consumption, or disposition outside the United States.

PROTECTIVE CLAIM
REQUEST FOR NET INTEREST RATE OF ZERO
PURSUANT TO IRR ACT SEC. 3301(c)(2)

Form **843**
(Rev. January 1997)
Department of the Treasury
Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

*Use Form 843 only if your claim involves (a) one of the taxes shown on line 3a or (b) a refund or abatement of interest, penalties, or additions to tax on line 4a.*

*Do not use Form 843 if your claim is for—*

- *An overpayment of income taxes;*
- *A refund of fuel taxes;*
- *An overpayment of excise taxes reported on Form 720, 730, or 2290 (see General Instructions).*

Please type or print

Name of claimant: General Electric Company & Subsidiaries
Your social security number:

Address (number, street, and room or suite no.): P.O. Box 2216
Spouse's social security number:

City or town, state, and ZIP code: Schenectady, NY 12301-2216
Employer identification number: 14: 0689340

Name and address shown on return if different from above: 1 River Road, Schenectady, NY 12301
Daytime telephone number: ( )

1 Period—prepare a separate Form 843 for each tax period
From 1973 through 1997/19, to , 19

2 Amount to be refunded or abated $

3a Type of tax, penalty, or addition to tax:
☒ Employment ☐ Estate ☐ Gift ☒ Excise (unless reported on Form 720, 730, or 2290—see instructions.)
☐ Penalty—IRC section ▶ Income tax

b Type of return filed (see instructions):
☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945 ☐ 990-PF ☐ 4720 ☒ Others (specify) 720 1120

4a Request for abatement or refund of:
☐ Interest caused by IRS errors or delays (if applicable—see instructions).
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

b Dates of payment ▶

5 **Explanation and additional claims.** Explain why you believe this claim should be allowed, and show computation of tax refund or abatement of interest, penalty, or addition to tax.

See Attachment

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

[signature] John M. Samuels 12/17/99
Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Vice President-Senior Counsel
Signature Date

**For Paperwork Reduction Act Notice, see separate instructions.** Cat. No. 10180R Form **843** (Rev. 1-97)

1/15/97 page 721,093

General Electric v. US
Complaint Exhibit 4

# GENERAL ELECTRIC COMPANY
# ATTACHMENT TO FORM 843 FOR 1973-1997
# ITEM 5 - EXPLANATION OF CLAIM

## Overview of Claim

Pursuant to § 3301 of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 741 ("the IRR Act"), General Electric Company ("GE") hereby files this protective claim to request that the Internal Revenue Service ("IRS") apply a net interest rate of zero with respect to equivalent overpayments and underpayments of GE's Federal taxes that are outstanding at the same time for all periods prior to the effective date of I.R.C. § 6621(d). This protective claim is being filed by GE on behalf of (i) GE and all the members (past and present) of GE's affiliated group of corporations (including their pre-acquisition taxable years), and (ii) RCA Corporation ("RCA") and all past members of its affiliated group of corporations. GE reserves the right to supplement and/or update this protective claim at such times as when additional information becomes available. Further, in this protective claim, GE is only requesting that the amount of each overpayment and underpayment of Federal taxes be used once for purposes of applying a net interest rate of zero.

## Background Information

GE is a corporation organized under the laws of the State of New York. For all relevant years, GE was the common parent of an affiliated group of corporations that filed consolidated Federal income tax returns. In addition, RCA (E.I.N. 13-1194630) was a corporation organized under the laws of the State of Delaware. For all relevant years up through June 9, 1986, RCA was the common parent of an affiliated group of corporations that filed consolidated Federal income tax returns. On June 9, 1986, GE acquired all of the outstanding stock of RCA and, as of that date, RCA and its subsidiaries become part of the affiliated group of corporations of which GE was the common parent. GE is now the successor to RCA with respect to RCA's pre-acquisition taxable years.

## Relevant Legal Authorities

As part of the IRR Act, Congress mandated that a net interest rate of zero is to apply to underpayments and overpayments of Federal taxes that are outstanding with respect to the same taxpayer at the same time. IRR Act § 3301, codified at I.R.C. § 6621(d). Section 6621(d) generally applies to interest accruing after July 22, 1998. Id. However, IRR Act § 3301(c)(2) provides that I.R.C. § 6621(d) applies retroactively, if (i) the taxpayer reasonably identifies and establishes the periods of such tax overpayments and underpayments for which the net interest rate of zero is to apply, and (ii) not later than December 31, 1999, the taxpayer requests the IRS to apply I.R.C. § 6621(d) to such periods.

## GE's Protective Claim

In accordance with IRR Act § 3301(c)(2), GE is hereby filing this protective claim to request that the IRS retroactively apply I.R.C. § 6621(d) and utilize a net interest rate of zero with respect to equivalent overpayments and underpayments of Federal taxes (including accrued interest thereon) that are (or were, or will be) outstanding at the same time with respect to (i) GE's 1973 through 1997 consolidated taxable years, (ii) the pre-acquisition taxable years (if any) of each member (past and present) of GE's affiliated group of corporations, and (iii) the individual taxable years (including pre-acquisition

taxable years) of each member (past and present) of GE's affiliated group of corporations with respect to all Federal excise and employment taxes. GE further requests that the IRS retroactively apply I.R.C. § 6621(d) and utilize a net interest rate of zero with respect to equivalent overpayments and underpayments of Federal taxes (including accrued interest thereon) that are (or were, or will be) outstanding at the same time with respect to (i) RCA's 1979 through 1986 consolidated taxable years, and (ii) GE's 1986 through 1997 consolidated taxable years (e.g., a net interest rate of zero should be applied to an equivalent RCA overpayment and a GE underpayment that are outstanding at the same time). Finally, when the IRS retroactively applies I.R.C. § 6621(d) to the years noted above, GE requests that the IRS do so in a manner that maximizes the financial benefit to GE (e.g., an overpayment should be netted against an underpayment that is accruing interest at the I.R.C. § 6621(c) rate, rather than an underpayment that is accruing interest at the I.R.C. § 6621(a)(2) rate).

Overpayment Years

As of the date of this claim, GE and the IRS have agreed that GE (including certain members of its affiliated group) and RCA (including certain members of its affiliated group) had overpayments of Federal taxes (exclusive of interest) for the years, time periods, and in the amounts shown below ("the Overpayment Years"):

| Taxpayer | Year | Type of Tax | Amount | Overpayment Period |
|---|---|---|---|---|
| GE | 1973 | Income | $15,383,536 | 3-15-74 to 5-7-90 |
| GE | 1974 | Income | $7,863,376 | 3-15-75 to 10-11-91 |
| GE | 1978 | Income | $15,497,938 | 9-30-88 to 7-22-98 |
| GE | 1979 | Income | $37,170,101 | 3-15-80 to 7-22-98 |
| GE | 1980 | Income | $52,197,054 | 6-15-81 to 7-22-98 |
| GE | 1981 | Income | $12,724,196 | 3-15-82 to 7-22-98 |
| GE | 1982 | Income | $20,842,404 | 3-15-83 to 7-22-98 |
| GE | 1982 | Excise | $97,968 | 3-15-83 to 4-21-88 |
| GE | 1983 | Income | $29,395,004 | 3-15-84 to 7-22-98 |
| GE | 1984 | Income | $73,243,075 | 3-15-85 to 7-22-98 |
| GE | 1984 | Excise | $823,381 | 3-15-85 to 11-14-88 |
| GE | 1985 | Income | $18,851,083 | 3-15-86 to 7-22-98 |
| GE | 1985 | Excise | $702,815 | 3-15-86 to 3-28-89 |
| RCA | 1979 | Income | $14,424,085 | 3-15-81 to 7-22-98 |
| RCA | 1981 | Income | $454,470 | 3-15-82 to 7-22-98 |
| RCA | 1982 | Income | $2,085,490 | 3-15-83 to 7-22-98 |
| RCA | 1983 | Income | $1,769,169 | 3-15-84 to 7-22-98 |
| RCA | 1984 | Income | $431,681 | 3-15-85 to 7-22-98 |
| RCA | 1985 | Income | $231,495 | 3-15-86 to 7-22-98 |
| RCA | 1986 | Income | $192,912 | 8-24-86 to 7-22-98 |

Underpayment Years

As of the date of this claim, GE and the IRS have agreed that GE (including certain members of its affiliated group) and RCA (including certain members of its affiliated group) had underpayments of Federal income taxes (exclusive of interest) for the years, time periods, and in the amounts shown below ("the Underpayment Years"):

| Taxpayer | Year | Type of Tax | Amount | Underpayment Period |
|---|---|---|---|---|
| GE | 1976 | Income | $6,230,522 | 3-15-77 to 4-9-91 |
| GE | 1977 | Income | $21,157,605 | 3-15-78 to 9-2-88 |
| GE | 1978 | Income | $32,159,589 | 3-15-79 to 9-30-88 |
| GE | 1986 | Income | $70,617,583 | 3-15-87 to 2-22-91 |
| GE | 1987 | Income | $401,813,144 | 3-15-88 to 2-22-91 |
| RCA | 1981 | Income | $4,433,037 | 3-15-82 to 10-14-92 |

Undetermined Years

As of the date of this claim, GE and the IRS have not yet reached any agreements as to whether there are any overpayments or underpayments of Federal income taxes with respect to the GE affiliated group for 1988-1997, as well as many pre-acquisition years of members (past and present) of GE's affiliated group of corporations. Further, GE and the IRS have not yet reached any agreements as to whether there are any overpayments or underpayments of excise taxes and/or employment taxes with respect to the individual taxable years (including pre-acquisition years) of each member (past and present) of GE's affiliated group of corporations for 1991-1997. If GE and the IRS subsequently agree (or if a court ultimately determines) that there are any overpayments or underpayments of Federal taxes for any one or more of these years, GE hereby requests that I.R.C. § 6621(d) be retroactively applied to these years to the maximum extent permitted by law.

Redetermined Years

If GE and the IRS subsequently agree (or if a court ultimately determines) that there are any overpayments and/or underpayments of Federal taxes for one or more of the Overpayment Years and/or the Underpayment Years (other than the amounts shown in the above tables), GE hereby requests that I.R.C. § 6621(d) be retroactively applied to those redetermined years to the maximum extent permitted by law.

UNITED STATES TAX COURT

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY AND SUBSIDIARIES, Petitioner, | ) | |
| v. | ) | Docket No. 14715-92 |
| COMMISSIONER OF INTERNAL REVENUE, Respondent. | ) | |

PETITION

The petitioner hereby petitions for a redetermination of the deficiency set forth by the Commissioner of Internal Revenue in the Commissioner's notice of deficiency dated April 2, 1992, and as the basis for the petitioner's case alleges as follows:

1. The petitioner is a corporation organized under the laws of the State of New York, with its principal office now at 3135 Easton Turnpike, Fairfield, Connecticut 06431. Petitioner's taxpayer identification number is 14-0689340. The consolidated returns for the taxable years here involved (calendar years 1979 and 1980) of the affiliated group of which petitioner is the common parent were timely filed with the Office of the District Director of the Internal Revenue Service at Albany, New York.

2. The notice of deficiency (a copy of which, including so much of the statement and schedules accompanying the notice as is material, is attached and marked Exhibit A) was mailed to the petitioner on April 2, 1992, and was issued by the Appeals Office of the Internal Revenue Service at Hartford, Connecticut.

3. The deficiencies as determined by the Commissioner are in income taxes for the calendar years 1979 and 1980, in the amounts

of $23,847,089 and $221,968,862, respectively, all of which are in dispute. Petitioner is also entitled to refunds of overpayments of income taxes for the taxable years 1979 and 1980.

4. The determination of the tax set forth in the said notice of deficiency is based upon the following errors:

(a) Respondent has erroneously determined that petitioner's method of accruing liabilities incurred under certain aircraft engine warranties is not proper on the grounds that, at the time the aforementioned liabilities were accrued, all the events had not yet occurred to determine the fact of petitioner's liability and the amount of the liability could not be determined with reasonable accuracy. As a result, respondent has erred in increasing petitioner's income by $1,046,100 and $4,083,500, for taxable years 1979 and 1980, respectively.

(b)(i) Respondent has erroneously determined that petitioner's "nuclear fuel products" (by which term respondent presumably refers to petitioner's nuclear fuel products product lines) do not qualify as "export property" for domestic international sales corporation ("DISC") purposes. Respondent therefore has erroneously concluded that sales commissions paid to General Electric International Sales Corporation ("GEISCO"), a qualified DISC, in connection with the sales of such fuel bundles were overstated in the amounts of $1,583,676 and $2,610,283, for taxable years 1979 and 1980, respectively. As a result, respondent has erred in increasing petitioner's income by the difference between the disallowed sales commissions and the corresponding

reduction in the dividends deemed paid by GEISCO to petitioner.

(ii) Furthermore, with respect to sales commissions paid to GEISCO, respondent has erroneously demanded an "intercompany pricing" adjustment (presumably in the transfer prices at which petitioner hypothetically could have sold certain export property to GEISCO), and, as a result, has incorrectly determined that such sales commissions were overstated by $16,848,015 and $19,493,216, for taxable years 1979 and 1980, respectively. As a result, respondent has erred in increasing petitioner's income by the difference between the disallowed commissions and the corresponding reduction in the dividends deemed paid by GEISCO to petitioner.

(iii) Furthermore, if the sales of nuclear fuel products (referred to in paragraph 4(b)(i), above) are found to qualify as sales of export property, respondent, with respect to commissions for such fuel bundle sales, has erroneously required in the alternative an "intercompany pricing" adjustment, and, as a result, has incorrectly determined in the alternative that sales commissions paid to GEISCO were overstated by $1,583,676, for taxable year 1979.

(iv) Finally, even if respondent's determinations with respect to the overstatements of sales commissions are correct, respondent has incorrectly calculated the amounts by which petitioner's income would be increased for the taxable years in issue.

(c) Respondent has erroneously determined that the Subpart F income reported by Utah International, Inc. ("Utah") and Utah-

Marcona Corporation ("UMC"), for the taxable years 1979 and 1980, was understated, due to the following reasons:

(i) Respondent erroneously determined that the deficit in earnings and profits of Utah Transport Inc. ("Old UTI"), in the amount of $27,685,113, which deficit arose prior to the reorganization of Old UTI and Marcona Ocean Services Ltd. ("MOSL"), may not be used to reduce the earnings and profits of the post-reorganization Utah Transport Inc. ("New UTI"), pursuant to I.R.C. Sections 952(c), 367, 368, 381, and the regulations issued thereunder.

(ii) Furthermore, respondent erroneously determined that Old UTI's pre-reorganization deficit in earnings and profits may not be utilized by New UTI, because the above-noted reorganization was not carried out for business purposes.

(iii) Furthermore, respondent erroneously determined that I.R.C. Section 269 prohibits Old UTI's pre-reorganization deficit in earnings and profits from being utilized by New UTI, because the principal purpose for the aforementioned reorganization was the avoidance of Federal taxes.

(iv) Moreover, if it is determined that the pre-reorganization deficit in Old UTI's earnings and profits may be utilized by New UTI to limit its earnings and profits, respondent has erroneously determined, in the alternative, that I.R.C. Sections 367 and 381 only allow said pre-reorganization deficit in earnings and profits to be used to reduce earnings and profits which accumulated after the date of the reorganization.

(v) Furthermore, respondent has erroneously determined that losses realized on the sales of certain vessels were improperly included in the calculation of the earnings and profits of MOSL. As a result, respondent has erred in determining that as of November 30, 1978, the earnings and profits of MOSL were $3,292,974, rather than a $2,958,270 deficit in earnings and profits.[1]

(vi) In addition, respondent has erroneously determined that MOSL paid a dividend of $9,000,000 to Marcona International S.A. ("MISA"), which payment is includable in the Subpart F income from MISA for taxable year 1979. As a result, respondent has erred by determining, in the alternative, that if her asserted adjustments set forth in paragraphs (i) through (iv), above, are not sustained, then the Subpart F income reportable from MISA which is attributable to the alleged $9,000,000 dividend is to be increased.

(vii) As a result of the errors noted in paragraphs 4(c)(i) through 4(c)(v), above, respondent has erroneously determined that the foreign base company income of New UTI is $5,084,163 and $6,650,199, for taxable years 1979 and 1980, respectively. The respondent further erred by determining this alleged foreign base company income is reportable as Subpart F income by Utah and UMC for the taxable years in issue.

---

[1] Although respondent has averred in her statutory notice that as of November 30, 1978, MOSL's reported deficit in earnings and profits was $2,958,270, MOSL actually had only reported a deficit in earnings and profits of $2,956,160, as of that date.

(viii) As a result of the errors noted in paragraphs 4(c)(i) through 4(c)(v), above, respondent has erroneously determined that the Subpart F income reportable by Utah must be increased in the amounts of $2,514,119 and $2,918,908, for taxable years 1979 and 1980, respectively.

(ix) As a result of the errors noted in paragraphs 4(c)(i) through 4(c)(vi), above, respondent has erroneously determined that the Subpart F income reportable by UMC must be increased in the amounts of $2,301,667 and $3,216,363, for taxable years 1979 and 1980, respectively.

(x) As a result of the errors noted in paragraphs 4(c)(i) through 4(c)(v), above, respondent has erroneously determined that the Subpart F income of Marcona Carriers Ltd. ("Carriers") is $368,070 and $1,371,502, for taxable years 1979 and 1980, respectively. Furthermore, respondent has erroneously determined that the Subpart F income reportable by UMC is decreased by $317,949 for taxable year 1979, and increased in the amount of $790,852 for taxable year 1980.

(xi) As a result of the errors noted in paragraphs 4(c)(i) through 4(c)(vi), above, respondent has erroneously determined that the Subpart F income of MISA for taxable year 1979 is $626,916. Furthermore, respondent has erroneously determined that the Subpart F income reportable by UMC is increased in the amount of $626,916 for taxable year 1979.

(xii) Respondent has erroneously determined, as a result of her asserted adjustments in paragraph 4(c)(i) through 4(c)(xi),

above, that the deemed paid foreign tax credits and the Section 78 gross-up for Utah and UMC should be increased for taxable year 1980, in the amounts of $74,248 and $83,657, respectively.

(d) Respondent has erroneously determined that petitioner's method of accruing liabilities incurred with respect to liabilities relating to jet engine upgrade kits and other expenses, which were allegedly deducted as "discounts and allowances", is not proper on the grounds that, at the time the liabilities were allegedly accrued, all the events had not yet occurred to determine the fact of the liability and the amount of the liability could not be determined with reasonable accuracy. As a result, respondent has erred in increasing petitioner's income by $5,948,911 for taxable year 1980.

(e) Respondent has erroneously determined that amounts received by Utah, which allegedly relate to a reimbursement for reclamation costs, do not constitute "gross income from mining" for purposes of calculating Utah's depletion allowance under I.R.C. Section 613 for taxable year 1980. As a result, respondent has erred in decreasing Utah's depletion allowance by $585,664, for taxable year 1980.

(f)(i) Respondent has erroneously determined that petitioner's investment credit carrybacks from taxable years 1981 and 1982, which gave rise to petitioner's tentative allowance of $155,003,387 for taxable year 1979, are not allowable on the grounds that petitioner has only established that its investment credit carrybacks from taxable year 1981, to taxable year 1979, are

$24,648,266, and its investment credit carrybacks from taxable year 1982, to taxable year 1979, are $109,666,043. As a result, respondent has erred in decreasing petitioner's investment credit carrybacks from taxable years 1981 and 1982, to taxable year 1979, by $18,028,810.[2]

(ii) Respondent has erroneously determined that petitioner's credit carrybacks from taxable years 1982 and 1983, which gave rise to petitioner's tentative allowance of $208,045,396 for taxable year 1980, are not allowable. As a result, respondent has erred in decreasing petitioner's credit carrybacks from taxable years 1982 and 1983, to taxable year 1980, by $210,705,664.[3]

(g)(i) Respondent has erroneously failed to allow petitioner to allocate its net interest expense between domestic and export sales, for purposes of computing its DISC commissions for the taxable years in issue.

(ii) Respondent has erroneously failed to allow petitioner to recalculate its DISC commission for taxable year 1979, to take into account certain sales of aircraft engines to Boeing Aircraft, Inc. and McDonnel Douglas Corporation, which sales qualified as DISC sales.

---

[2] While respondent's statutory notice of deficiency for the taxable years in issue purports to disallow investment credit carrybacks of $20,689,078, from taxable years 1981 and 1982, to taxable year 1979, the statutory notice actually only disallows investment credit carrybacks of $18,028,810.

[3] While respondent's statutory notice of deficiency purports to disallow credit carrybacks of $208,045,396, from taxable years 1982 and 1983, to taxable year 1980, the statutory notice actually disallows credit carrybacks of $210,705,664.

(h) Respondent has erroneously determined that General Electric Real Estate Credit Corporation is not entitled to deduct a $700,000 deferred loss for taxable year 1980, which loss arose from its sale of an account receivable from Park Place Developers.

(i) Respondent has erroneously failed to allow petitioner to claim additional foreign tax credits for taxable years 1979 and 1980, in the amounts of $67,045 and $172,549, respectively, which credits arose from General Electric Information Services Co.'s payment of additional income taxes to the Government of Germany, for taxable years 1979 and 1980.

(j) Respondent has erroneously determined that petitioner's Western Hemisphere Trade Corporation deduction for 1979 is $512,540, rather than $625,643. As a result, respondent has erred in increasing petitioner's income by $113,103, for taxable year 1979.

5. The facts upon which petitioner relies, as the basis of its case, are as follows:

(a) Aircraft Engines - Warranties.

(i) Petitioner was engaged in the business of manufacturing and selling aircraft engines during the taxable years in issue. Petitioner employs the accrual method of accounting with respect to its business of manufacturing and selling aircraft engines, as authorized by I.R.C. Section 446(c).

(ii) Each of the various engine models manufactured by petitioner is sold to customers under contractual warranty.

(iii) One of the various warranties given for each engine is

the Campaign Change Warranty, pursuant to which petitioner is liable for some or all of the costs of compliance by the airline with "campaign changes". A "campaign change" is defined, in the relevant warranty manuals, as a "mandatory time compliance change required by a GE Service Bulletin and/or FAA Airworthiness Directive for introduction of a new part design, modification of a part, inspection of a part or replacement of a part when time limitations are imposed."

(iv) Petitioner's Customer Support Division retains detailed records indicating the purchaser of each engine sold under warranty, the warranty status of that engine, and whether the engine is still in service. Large airline customers submit monthly operating reports to petitioner listing, for each warranted engine that they own, the number of hours that engine has flown and the number of hours per day it flies.

(v) Upon identification of a problem with a particular engine model that is covered under warranty, petitioner's Aircraft Engine Business Group initiates a program plan to outline the nature of the problem with the engine, the corrective actions required to cure the problem, and the estimated cost of the corrective action.

(vi) Petitioner's Engineering Division determines the source of the problem that has been identified, and drafts a Design Change Instruction Authority setting forth the actions necessary to correct the problem and how quickly such action should be taken.

(vii) A "service bulletin" is then drafted to notify all purchasers of the affected engines of the existence of the

identified problem, to instruct them in detail how to correct the problem, and, if the problem is one subject to payment under warranty, to inform them how to obtain payment for costs attributable to the repair. The issuance of such service bulletins by petitioner is in accordance with Specification 100 -- Policy for Service Bulletins of the Air Transport Association.

(viii) The service bulletins issued by petitioner may be one of three types:

(a) An "Alert" service bulletin generally is issued only for matters related to air safety, including matters that are the subject of an Airworthiness Directive issued by the Federal Aviation Administration ("FAA").

(b) A "Campaign Change" service bulletin generally is issued only for significant engine problems, such as defects that are likely to cause an in-flight engine failure or those which, if not repaired, will cause damage requiring far more extensive repairs in the future. Each Campaign Change service bulletin sets forth a time within which the repair must be performed to maintain warranty coverage for the engine.

(c) A "Routine" service bulletin generally is issued for minor engine modifications or engine improvements.

(ix) Petitioner is liable, in whole or in part, under its Campaign Change Warranty, for all repairs made pursuant to Campaign Change service bulletins and almost all repairs made pursuant to Alert service bulletins.

(x) By issuing a service bulletin covered by the Campaign

Change Warranty, petitioner admits its liability for the warranted portion of the cost of repairing the problem identified in the bulletin.

(xi) As a consequence, once petitioner has informed its customers of the existence of specific defects in aircraft engines under the Campaign Change Warranty, all the events have occurred that determine the fact of petitioner's liability under that warranty to its customers.

(xii) Whenever a service bulletin covered by the Campaign Change Warranty is issued, petitioner accrues as a liability its estimated cost of repairs.

(xiii) The amount of petitioner's liability for a particular service bulletin is calculated through a detailed analysis of the cost of materials, parts and labor necessary to carry out the repair on all engines subject to the service bulletin and still under warranty.

(a) Petitioner's Customer Support Division determines how many of the affected engines are still under warranty, the status of each warranty, whether the engines are still in service, and who owns them.

(b) Petitioner's field engineering staff, after determining the repair necessary to cure the problem, calculates the number of manhours required to make that repair, and what parts and materials are required.

(c) Petitioner calculates its liability for parts and materials based on the cost of the necessary parts, the number of

affected engines, and the percentage of the cost of parts subject to reimbursement.

(d) To determine its liability for labor costs, when applicable, petitioner multiplies the manhours required to repair one engine by the number of affected engines still under warranty. It then multiplies that figure by a weighted average of the different warranty labor rates applicable to the affected customers.

(e) If the customer is given a "temporary" replacement part during repair and the replacement part cannot be reused, the cost of the temporary part, less scrap value, if any, is added into the calculations.

(xiv) Accordingly, petitioner has determined the cost of its liability under each service bulletin with reasonable accuracy.

(xv) At least annually, petitioner examines the amount accrued as a liability with respect to each service bulletin that it has issued. Based upon a review of its experience with costs to date under the service bulletin, amounts are restored to income if the accrual is determined to be too large, and additional amounts are accrued if the amount accrued is determined to be too small.

(xvi) Petitioner has consistently used this method of accounting for its liabilities to customers under its aircraft engine warranties.

(xvii) Amounts accrued as liabilities to customers under aircraft engine warranties are treated as liabilities for financial reporting purposes.

(xviii) Petitioner's method of accounting for its liabilities to customers under aircraft engine warranties is in accordance with generally accepted accounting principles.

(xix) Petitioner's method of accounting for its liabilities to customers under aircraft engine warranties is a proper method of accounting for such liabilities under I.R.C. Sections 446 and 461.

(b)(1) GEISCO Commissions -- Nuclear Fuel Products.

(i) GEISCO, petitioner's wholly-owned subsidiary, qualified as a DISC during taxable years 1979 and 1980, within the meaning of I.R.C. Section 992.

(ii) Petitioner was a "related supplier" to GEISCO, within the meaning of Treas. Reg. Sec. 1.994-1(a)(3)(ii), and used GEISCO as an agent to handle, on a commission basis, the sale and leasing of qualified export property and the providing of qualified services.

(iii) During taxable years 1979 and 1980, GEISCO served as a commission agent in connection with petitioner's export sales of so-called "nuclear fuel products", which are used by electric utilities in the production of electrical power from nuclear energy. A nuclear fuel product is a highly engineered container for an enriched uranium-based fuel, consisting of nuclear fuel rods (the actual container for the uranium-based fuel), tie plates, spacers and other parts.

(iv) With respect to petitioner's sales of nuclear fuel products as to which GEISCO charged a sales commission (the "Export Products"), petitioner sold only the product, i.e., the container,

not the enriched uranium compounds inside the container. The uranium compounds inside the rods were consigned to petitioner by its customers, and petitioner's customers continued to own the uranium compounds while they were in petitioner's possession. Petitioner's customers arranged for uranium compounds to be enriched by the U.S. Department of Energy, prior to delivery of the compounds to petitioner. Petitioner, after receiving enriched uranium compounds from its customers, processed the compounds into fuel pellets and inserted the fuel pellets into specifically prepared tubing (the fuel rods). Petitioner then assembled the fuel rods into finished fuel products, the product that was sold to the customer. Petitioner, however, did not sell the uranium compounds inside the rods to its customers.

(v) The Export Products sold by petitioner in 1979 and 1980: (a) were manufactured in the United States by a person other than GEISCO; (b) were held by petitioner in the ordinary course of its trade or business of selling nuclear fuel products for direct use, consumption or disposition outside the United States; (c) had a fair market value (exclusive of the uranium compound owned by the customers) that was not more than 50 percent attributable to articles imported into the United States; (d) were not sold or leased to a DISC (other than GEISCO) which was a member of the same controlled group (within the meaning of Treas. Reg. Sec. 1.993-1(k)) as GEISCO; and (e) were not products the export of which was prohibited or curtailed under Section 4(b) of the Export Administrative Act of 1969 for the purpose of protecting the

domestic U.S. economy.

(vi) At least 50 percent of the fair market value of such Export Products (exclusive of the uranium compound owned by the customers) was attributable to manufacturing or processing and not to a depletable product within the meaning of I.R.C. Sections 613 or 613A.

(vii) Such Export Products were not a primary product from oil, gas, coal or uranium.

(viii) Petitioner's Export Products therefore constituted export property within the meaning of I.R.C. Section 993(c). Accordingly, petitioner's sales of such property would have been a transaction subject to I.R.C. Section 994, if petitioner had sold the Export Products to GEISCO and GEISCO had resold the products to petitioner's customers. Therefore, GEISCO was entitled, under I.R.C. Section 994(b) and Treas. Reg. Sec. 1.994-1(d)(2), to fix its sales commissions from petitioner so as to produce the amount of income that such hypothetical sale-resale transaction would have produced.

(ix) Petitioner's activities in processing enriched uranium compounds into fuel pellets constituted services that were related and subsidiary, within the meaning of I.R.C. Section 993(a)(1)(C), to its sales of Export Products. Accordingly, GEISCO was entitled to charge a sales commission with respect to the providing of these services.

(x) Alternatively, if respondent is correct and the Export Products do not constitute qualified export property, it follows

that gross receipts from prior years' sales of Export Products do not constitute export gross receipts for purposes of determining GEISCO's taxable income for taxable years 1979 and 1980 attributable to base period export gross receipts. Accordingly, in including such receipts in GEISCO's base period export gross receipts, respondent has overstated the amount of the dividends deemed paid by GEISCO to petitioner, pursuant to I.R.C. Section 995(b).

(b)(2) GEISCO Commissions -- Pricing Issues.

(i) GEISCO's commissions on sales of export property were fixed, by agreement between petitioner and GEISCO, as the maximum amount permitted by I.R.C. Section 994. Accordingly, under Treas. Reg. Sec. 1.994-1(d)(2), GEISCO's commissions were required to be fixed so as to produce for GEISCO an amount of income for a year equal to the amount that GEISCO would have earned, if petitioner had sold the property to GEISCO and GEISCO had resold it to a third party, using as a transfer price for sales from petitioner to GEISCO the minimum permissible price determined under the inter-company pricing rules of I.R.C. Section 994 and the regulations thereunder.

(ii) As permitted by Treas. Reg. Sec. 1.994-1(c)(7), in determining commissions payable to GEISCO, petitioner grouped its sales of export property among approximately 80 different product lines.

(iii) Petitioner calculated the commission payable for each product line for 1979 and 1980 using either: (a) the 4 percent of

gross receipts method of Treas. Reg. Sec. 1.994-1(c)(2), under which the commission payable to GEISCO was fixed, subject to the so-called "no-loss" rule of Treas. Reg. Sec. 1.994-1(e)(1), as an amount equal to 4 percent of petitioner's gross receipts from sales of export property in the product line; or (b) the 50-50 combined taxable income method of Treas. Reg. Sec. 1.994-1(c)(3), under which the commission payable to GEISCO was fixed, subject again to the no-loss rule, as an amount equal to 50 percent of petitioner's taxable income from sales of export property, adjusted when advantageous to GEISCO by the marginal costing rules of Treas. Reg. Sec. 1.994-2. Because GEISCO had no export promotion expenses, such expenses did not enter into the calculation of the commissions payable.

(iv) Respondent's inter-company pricing adjustment is based on a report from her international examiner in which petitioner's method of determining its taxable income from sales of export property was challenged on the grounds that the method did not correctly attribute costs (including cost of goods sold) to export and non-export sales.

(v) Petitioner calculated its taxable income from sales of export property, for purposes of applying the 50-50 combined taxable income method and the no-loss rule, by subtracting from its gross receipts from the sale of export property within a product grouping its cost of goods sold for such property and such costs and expenses as were attributable to petitioner's gross income from the sale of such property.

(vi) In determining cost of goods sold for sales of export property within a product grouping, petitioner employed information derived from its books and records and applied its usual accounting methods and conventions. Such procedure, methods and conventions were consistent with the rules of Treas. Reg. Section 1.61-3, governing the cost of goods sold.

(vii) In determining costs and expenses attributable to sales of export property within a product grouping, petitioner also employed information derived from its books and records. Petitioner attributed to sales of export property both those of its costs and expenses that were definitely related to its gross income from sales of export property and a pro rata portion of its costs and expenses that were not definitely related to any class of its gross income. In allocating and apportioning costs and expenses for these purposes, petitioner applied its usual accounting methods and conventions, insofar as they were consistent with the rules governing the allocation and apportionment of deductions contained in Treas. Reg. Sec. 1.861-8, and applied the rules of Treas. Reg. Sec. 1.861-8 to the extent that its usual accounting methods and conventions were inconsistent with those rules.

(viii) As a result of applying the methods described above, petitioner determined that its total commissions payable to GEISCO for taxable years 1979 and 1980 were $143,968,820 and $184,282,170, respectively, and petitioner reported these amounts on its consolidated income tax returns for the relevant years.

(ix) Accordingly, petitioner had deductions under I.R.C.

Section 162 for selling expenses, in the amounts of at least $143,968,820 and $184,282,170, for taxable years 1979 and 1980, respectively. GEISCO thus had taxable income for taxable year 1979 of $184,938,722 (calculated as gross income from sales commissions of $143,968,820, plus other income of $40,984,012, less deductions of $14,110) and taxable income for the year 1980 of $247,807,731 (calculated as gross income from sales commissions of $184,282,170, plus other income of $63,541,225, less deductions of $15,664).

(x) In taxable year 1979, GEISCO: (a) derived no gross interest from producer's loans, within the meaning of I.R.C. Section 993(d); (b) recognized no gain from the sale or exchange of property described in I.R.C. Section 995(b)(1)(B) or (C); (c) had taxable income of $8,439,917, attributable to military property; (d) had taxable income of $58,651,965, attributable to base period export gross receipts, as defined in I.R.C. Section 995(e); (e) had taxable income of $58,923,420, attributable to 50 percent of the excess of adjusted taxable income, as defined in I.R.C. Section 995(e)(2), over taxable income attributable to base period export gross receipts; (f) had an international boycott factor under I.R.C. Section 999 of zero; (g) did not pay and did not have paid on its behalf any illegal payment described in I.R.C. Section 995(b)(1)(F)(iii); and (h) had no amount of foreign investment attributable to producer's loans, as defined in I.R.C. Section 995(d). Accordingly, petitioner's deemed distribution from GEISCO under I.R.C. Section 995(b)(1) was $126,015,302, an amount that was less than its earnings and profits for the year.

(xi) In the year 1980, GEISCO: (a) derived no gross interest from producer's loans, within the meaning of I.R.C. Section 993(d); (b) recognized no gain from the sale or exchange of property described in I.R.C. Section 995(b)(1)(B) or (C); (c) had taxable income of $8,835,611, attributable to military property; (d) had taxable income of $73,439,716, attributable to base period export gross receipts, as defined in I.R.C. Section 995(e); (e) had taxable income of $82,766,200, attributable to 50 percent of the excess of adjusted taxable income, as defined in I.R.C. Section 995(e)(2), over taxable income attributable to base period export gross receipts; (f) had an international boycott factor under I.R.C. Section 999 of zero; (g) did not pay and did not have paid on its behalf any illegal payment described in I.R.C. Section 995(b)(1)(F)(iii), and (h) had no amount of foreign investment attributable to producer's loans, as defined in I.R.C. Section 995(d). Accordingly, petitioner's deemed distribution from GEISCO under I.R.C. Section 995(b)(1) was $165,041,532, an amount that was less than its earnings and profits for the year.

(xii) Finally, if it is determined that GEISCO's taxable income from commissions were overstated, petitioner is entitled to the relief afforded by Rev. Proc. 85-45, 1985-2 C.B. 505, with respect to actual distributions from GEISCO, because its arrangements and transactions did not have as one of its principal purposes the avoidance of Federal income tax.

Utah International, Inc. and Utah-Marcona Corporation Subpart F Income.

(c)(1) Reorganization of UTI and MOSL.

(i) On or about August 26, 1979, Marcona Ocean Services, Ltd. ("MOSL"), a Liberian corporation and a third-tier subsidiary of petitioner, acquired 100% of the outstanding stock of Utah Transport, Inc. ("Old UTI"), a Liberian corporation and a second-tier subsidiary of petitioner, from Utah International, Inc. ("Utah"), in exchange for 9,782 shares (49.45%) of MOSL common stock. A

(ii) Prior to this exchange, MOSL was a wholly-owned subsidiary of Marcona International, S.A. ("MISA"), a Panamanian corporation, which was a wholly-owned subsidiary of Utah-Marcona Corporation ("UMC"), which in turn was a wholly-owned subsidiary of petitioner. Old UTI was a wholly-owned subsidiary of Utah, which in turn was a wholly-owned subsidiary of petitioner. A

(iii) Following the above-noted exchange, Old UTI was merged into MOSL under Liberian law, with MOSL being the surviving corporation. Subsequent to this merger, the name of the surviving corporation (MOSL) was changed to Utah Transport, Inc. ("New UTI"). A

(iv) At the time of the merger, Old UTI had an accumulated deficit in its earnings and profits account of $27,685,113. A

(v) During the taxable years in issue, New UTI and MISA qualified as Controlled Foreign Corporations, as defined in Section 957, and so UMC and Utah were required to include in gross income for said years their pro rata shares of New UTI's Subpart F income for such years. A

(vi) MOSL's (now New UTI) acquisition and then liquidation of Old UTI served various and substantial business purposes including, inter alia, reducing the number of operating statements, tax reports and other business records required of New UTI; eliminating duplicative administrative, accounting and other overhead expenses; and simplifying overall operations and management.

(vii) New UTI's acquisition and then liquidation of Old UTI constituted a reorganization described in I.R.C. Section 368(a)(1)(C). Thus, in computing its earnings and profits for purposes of I.R.C. Section 952(c) for the taxable years in issue, New UTI properly took into account Old UTI's pre-acquisition deficit in earnings and profits.

(viii) Based upon paragraphs (i) through (vii), above, Utah and UMC properly reported their pro rata shares of New UTI's Subpart F income for the taxable years in issue.

(c)(2) Transfer of Vessels from Marcona Carriers to MOSL.

(i) In 1976, MOSL was a wholly-owned subsidiary of Marcona Carriers ("Carriers"), a Liberian corporation. On or about November 9, 1976, Carriers owned two vessels, the SS Marcona Pathfinder and the SS Marcona Prospector, and its adjusted tax bases in these vessels were $6,489,703 and $5,957,137, respectively.

(ii) On or about November 10, 1976, Carriers transferred the aforementioned vessels to MOSL, in an I.R.C. Section 351 transaction. Pursuant to I.R.C. Section 362(a), MOSL succeeded to Carriers' adjusted tax bases in the vessels.

(iii) In December of 1976, MOSL sold the Vessel SS Marcona Pathfinder to an unrelated entity for $3,250,000, and properly recognized a $3,615,410 loss in the transaction. In March of 1977, MOSL sold the Vessel SS Marcona Prospector to an unrelated entity for $3,250,000, and properly recognized a $2,633,756 loss in this transaction.

(iv) MOSL's recognizing of the losses noted in paragraph (iii), above, clearly reflected the income of the Marcona group of corporations.

(v) To the extent it may be determined that the losses incurred on the sales of the aforementioned vessels should be reallocated to Carriers, then Carriers is entitled to utilize said losses in computing its Subpart F income for the taxable years in issue, pursuant to I.R.C. Section 952(c).

(c)(3) <u>MOSL's Cash Payment to Marcona International, S.A.</u>.

(i) During 1979, MOSL was a wholly-owned subsidiary of MISA, which in turn was a wholly-owned subsidiary of UMC. On or about July 16, 1979, the Board of Directors of MOSL elected to reduce the paid-in capital of the Corporation by $9,000,000. Subsequently, $9,000,000 was paid from MOSL to MISA.

(ii) Since MOSL (which became New UTI) had an accumulated deficit in earnings and profits at the end of taxable year 1979, and since MOSL did not have current earnings and profits of $9,000,000 in 1979, the $9,000,000 payment from MOSL to MISA was a dividend to MISA only to the extent of MOSL's current earnings and profits for taxable year 1979. <u>See</u> I.R.C. Section 316(a).

(iii) To the extent MOSL's $9,000,000 payment to MISA was a dividend though, this dividend did not increase MISA's Subpart F income to UMC for taxable year 1979, due to the chain deficit rule under I.R.C. Section 952(d).[4]

(iv) Furthermore, MOSL's $9,000,000 payment to MISA did not increase MISA's Subpart F income to UMC for taxable year 1979, to the extent said amount constituted "previously taxed earnings and profits" of MOSL, as that term is defined in I.R.C. Section 959.

(c)(4) Deemed Paid Foreign Tax Credits.

(i) To the extent UMC and/or Utah are required to increase their pro rata shares of the Subpart F income of New UTI and/or MISA for the taxable years in issue, then UMC and/or Utah, as the case may be, are entitled to increase their deemed paid foreign tax credits for taxable years 1979 and 1980, pursuant to the provisions of I.R.C. Sections 960, 902 and 901.

(d) Aircraft Engines - Accrued Discounts & Allowances.

(i) Petitioner was engaged in the business of selling aircraft engines during the taxable years in issue.

(ii) By the end of taxable year 1980, petitioner had entered into sixteen separate contracts in connection with the sales of aircraft engines, under which petitioner was contractually obligated to: (a) make certain technological changes to various

---

[4] As of December 31, 1979, New UTI had an accumulated deficit in earnings and profits of $21,372,242. Accordingly, this accumulated deficit in New UTI's earnings and profits would wipe out any increase in MISA's Subpart F income to UMC for taxable year 1979, which resulted from MOSL's dividend to MISA. See I.R.C. Section 952(d).

engines which it had sold or was in the process of selling; (b) reimburse certain of its airline customers for costs they would incur in making these technological changes to various engines which they had purchased or were in the process of purchasing; or (c) provide an allowance to certain of its airline customers for tooling, spare parts and maintenance upon delivery of the aircraft engines which petitioner had sold to these customers.

(iii) The amounts at issue under the aforementioned contracts are as follows:

| Contract | Amount at Issue |
|---|---|
| Item # 3 - Air France | $ 491,940 |
| Item # 4 - Air France | 78,000 |
| Item # 6 - AeroMexico | 510,000 |
| Item # 10 - All Nippon | 84,997 |
| Item # 12 - All Nippon | 525,847 |
| Item # 19 - Eastern | 126,474 |
| Item # 21 - Eastern | 459,357 |
| Item # 31 - Malaysia | 360,000 |
| Item # 33 - Olympic | 11,565 |
| Item # 34 - Olympic | 526,778 |
| Item # 40 - Singapore | 41,481 |
| Item # 41 - Singapore | 1,245,223 |
| Item # 46 - Transamerica | 445,504 |
| Item # 47 Transamerica | 147,858 |
| Item # 51 - Trans-Australia | 500,000 |
| Item # 54 - Varig | 393,887 |
| Total | $5,948,911 |

(iv) Item # 3 involved a contract with Air France in which, in consideration for Air France's agreement to purchase aircraft with GE engines, petitioner agreed to provide Air France with upgrade kits for the new engines being ordered, as well as for engines already installed on Air France aircraft. As of December 31, 1980, the new aircraft with GE engines had been delivered to Air France. The accrual in issue represents the cost of upgrade

kits that had not yet been provided to Air France.

(v) Item # 4 also involved a contract with Air France in which, in consideration for Air France's agreement to purchase certain engine equipment, petitioner agreed to pay Air France's expenses in purchasing certain "quick engine change" kits. The accrual in issue represents the amount due Air France for these purchases.

(vi) Item # 6 involved a contract with Aeromexico in which, in consideration for Aeromexico's agreement to purchase two aircraft with GE engines, petitioner agreed to provide Aeromexico with various allowances for spare parts, engine upgrading, tooling, overhaul facility maintenance training and advertising. As of December 31, 1980, the engines for the first aircraft had been delivered. The accrual in issue represents the amount due Aeromexico for the aforementioned allowances with respect to the delivered engines.

(vii) Item # 10 involved a contract with All Nippon in which, in consideration for All Nippon's agreement to purchase GE engines, petitioner agreed to provide All Nippon with a labor allowance to cover the cost of installing equipment designed to upgrade GE engines on existing All Nippon aircraft. As of December 31, 1980, four engines had been upgraded. The accrual in issue represents the cost of upgrading thirteen additional engines.

(viii) Item # 12 also involved a contract with All Nippon in which, in consideration for All Nippon's agreement to purchase aircraft with GE engines, petitioner agreed to provide All Nippon

with upgrade kits for the engines to be delivered, and to retrofit GE engines on existing All Nippon aircraft with these kits. As of December 31, 1980, all engines and aircraft had been delivered to the airline. The accrual in issue represents the cost of 10 upgrade kits that had not yet been provided and 15 engine updates yet to be completed.

(ix) Item # 19 involved a contract with Eastern Airlines in which, in consideration for Eastern's agreement to purchase aircraft with GE engines, petitioner agreed to provide Eastern with upgrade kits for GE engines previously installed on Eastern aircraft. The accrual in issue represents the cost of upgrade kits that had not yet been provided.

(x) Item # 21 also involved a contract with Eastern Airlines in which, in consideration for Eastern's agreement to purchase aircraft with GE engines, petitioner agreed to provide Eastern with upgrade kits for all engines that had been delivered to Eastern before 1980 and to retrofit GE engines on existing Eastern aircraft with these kits. The accrual in issue represents the cost of 13 upgrade kits that had not yet been provided and 14 engine updates yet to be completed.

(xi) Item # 31 involved a contract with Malaysia in which, in consideration for Malaysia's agreement to purchase aircraft with GE engines, petitioner agreed to provide Malaysia with upgrade kits for these engines. As of December 31, 1980, engines for six aircraft had been delivered either to Malaysia or to the aircraft manufacturer. The accrual in issue represents the cost of 4

upgrade kits that had not yet been provided.

(xii) Item # 33 involved a contract with Olympic Airways in which, in consideration for Olympic's agreement to purchase aircraft with GE engines, petitioner agreed to provide Olympic with a $350,000 credit to assist the airline with the cost of unique tools and facilities for line maintenance and module changes for the engines. The accrual in issue represents the unpaid portion of this credit.

(xiii) Item # 34 also involved a contract with Olympic Airways in which, to encourage Olympic to purchase GE engines, petitioner agreed to provide Olympic with upgrade kits for preexisting aircraft, as well as a labor allowance to cover their installation costs. The accrual in issue represents the cost of 5 upgrade kits that had not yet been provided and seven labor allowances that had not yet been paid.

(xiv) Item # 40 involved a contract with Singapore Airlines in which, in consideration for Singapore's agreement to purchase aircraft with GE engines, petitioner agreed to provide Singapore with upgrade kits for seventeen engines which were to be delivered, and to retrofit these seventeen engines. As of December 31, 1980, all seventeen engines had been shipped. The accrual in issue represents the cost of 4 engine updates yet to be completed.

(xv) Item # 41 also involved a contract with Singapore Airlines in which, in consideration for Singapore's agreement to purchase aircraft with GE engines, petitioner agreed to retrofit GE engines on existing Singapore aircraft with upgrade kits. As of

December 31, 1980, twenty-three engines had been delivered to Singapore. The accrual in issue represents the cost of 14 upgrade kits that had not yet been provided.

(xvi) Item # 46 involved a contract with Transamerica in which, in consideration for Transamerica's agreement to purchase aircraft with GE engines, petitioner agreed to provide Transamerica with upgrade kits. The accrual in issue represents the cost of 4 upgrade kits that had not yet been provided.

(xvii) Item # 47 also involved a contract with Transamerica in which, in consideration for Transamerica's agreement to purchase two aircraft with GE engines, petitioner agreed to provide Transamerica with eleven improved exhaust nozzles for these engines. As of December 31, 1980, the engines for the two aircraft had been delivered to Transamerica. The accrual in issue represents the cost of these 11 nozzles that had not yet been provided.

(xviii) Item # 51 involved a contract with Trans-Australia in which, in consideration for Trans-Australia's agreement to purchase aircraft with GE engines, petitioner agreed to provide Trans-Australia with an allowance toward the purchase of various equipment necessary to maintain the engines. As of December 31, 1980, two engines had been delivered. The accrual in issue represents Trans-Australia's allowance for purchasing these two engines.

(xix) Item # 54 involved a contract with Varig in which, in consideration for Varig's agreement to purchase aircraft with GE

engines, petitioner agreed to provide Varig with fourteen improved exhaust nozzles for these engines. As of December 31, 1980, all engines had been shipped to the aircraft manufacturer, while only one nozzle had been provided. The accrual in issue represents the cost of the remaining 13 nozzles.

(xx) With respect to paragraphs (iv) through (xix), above, petitioner properly accrued the disputed items shown therein. D

(e) Utah International, Inc. - Depletion.

(i) Utah International, Inc. ("Utah"), a wholly-owned subsidiary of petitioner during the taxable years in issue, was engaged in the business of mining and selling coal. A

(ii) On or about August 18, 1960, Utah entered into a thirty-five year contract to sell coal from its Navajo Mine to the Arizona Public Service Company. The Navajo Mine was located in the State of New Mexico. A

(iii) Section 8.1 of said contract provided for an escalation in the sale price of the coal from the Navajo Mine, in the event of extreme or radical changes in various economic factors and conditions from those in existence at the date the contract was executed. A

(iv) During the term of the contract, New Mexico enacted a coal mining surface act for the purpose of regulating the reclamation of lands disturbed by surface mining of coal. This enactment constituted an extreme or radical change in economic factors and conditions from those in existence at the time the aforementioned contract had been executed. A

(v) Accordingly, in 1980, Utah increased the sale price of the coal from the Navajo Mine, pursuant to Section 8.13(d) of the contract. In its monthly billing statements to the Arizona Public Service Company, Utah separately itemized its costs of reclamation.

(vi) During 1980, petitioner received $7,091,784 in respect of these reclamation items, which amount it properly treated as gross income from mining for purposes of computing its depletion allowance under I.R.C. Section 613.

(vii) In the event it is determined that the aforementioned increase in the sale price of the coal from the Navajo Mine does not constitute gross income from mining, which petitioner specifically denies, then Utah's reclamation expenses should not be deducted from its gross income from mining, for purposes of computing its taxable income from the property under Treas. Reg. Section 1.613-5(a).

(viii) Utah was subject to the fifty percent taxable income limitation under Treas. Reg. Section 1.613-5(a) with respect to the Navajo Mine for taxable year 1980. Thus, if Utah's reclamation expenses are not deducted from its gross income from mining for taxable year 1980, then Utah's depletion deduction with respect to the Navajo Mine for said year will not be decreased, even if it is determined that the aforementioned increase in the sale price of the coal does not constitute gross income from mining.

(f) <u>Tax Credit Carrybacks</u>.

(i) For taxable years 1981, 1982 and 1983, petitioner's liability for tax, within the meaning of I.R.C. Section 46(a)(4),

was not in excess of $283,737,940, $125,846,857 and $51,334,515, respectively. Accordingly, petitioner could claim no more than $226,995,352, $113,264,671 and $43,638,088 in investment credits for taxable years 1981, 1982 and 1983, respectively.

(ii) In 1981, 1982 and 1983, petitioner had available, absent the limitation of I.R.C. Section 46(a)(3), investment credits in excess of $447,769,511, $252,923,165 and $210,832,391, respectively.

(iii) Thus, petitioner is entitled to carryback to taxable year 1979 investment credits in the amount of $157,911,082. Moreover, petitioner is entitled to carryback to taxable year 1980 investment credits in the amount of $188,751,595.

(iv) For taxable year 1983, petitioner's tentative business energy investment credits were $13,358,850. Pursuant to the limitation contained in I.R.C. Section 46(a)(4) though, petitioner could claim no more than $7,696,427 in business energy investment credits for taxable year 1983. Accordingly, petitioner is entitled to carryback to taxable year 1980 business energy investment credits in the amount of $5,662,423.

(v) For taxable year 1983, petitioner was entitled to tentative jobs credits in the amount of $141,355. Since petitioner could not use these credits for taxable year 1983, it properly elected to carryback the credits to taxable year 1980.

(vi) For taxable year 1983, petitioner was entitled to tentative research credits in the amount of $4,217,812. Since petitioner could not use these credits for taxable year 1983, it

properly elected to carryback the credits to taxable year 1980.

(vii) For taxable year 1983, petitioner was entitled to tentative employee stock ownership plan credits in the amount of $35,700,664. Since petitioner could not use these credits for taxable year 1983, it properly elected to carryback the credits to taxable year 1980.

(g)(1) General Electric International Sales Corporation.

(i) During taxable years 1979 and 1980, General Electric International Sales Corporation ("GEISCO") was a wholly-owned subsidiary of petitioner, and qualified as a Domestic International Sales Corporation ("DISC") under IRC Section 992.

(ii) Petitioner utilized GEISCO as an agent for the sale of various products abroad, and compensated GEISCO on a commission basis. The commission agreement between petitioner and GEISCO provided that petitioner would pay GEISCO a commission equal to the maximum commission permitted to be received by a DISC under Section 994.

(iii) During taxable years 1979 and 1980, petitioner determined the amounts of the commissions payable to GEISCO by using the "50% combined taxable income" and the "4 percent qualified export receipts" intercompany pricing methods described in Section 994(a).

(iv) For purposes of computing petitioner's and GEISCO's combined taxable income ("CTI") for taxable years 1979 and 1980, petitioner allocated its gross interest expense between domestic and export sales, under the principles of Treas. Reg. Sec. 1.861-8.

(v) Petitioner, however, was only required to allocate its net interest expense between domestic and export sales, for purposes of computing CTI. See generally Dresser Industries, Inc. v. Commissioner, 90-2 USTC Par. 50,505 (5th Cir.), rev'g in pertinent part, 92 T.C. 1276 (1989), nonacq., 1991 AOD (Lexis) 18.

(vi) If petitioner had allocated its net interest expense, rather than its gross interest expense, between domestic and export sales, for purposes of computing CTI, then petitioner would have allocated approximately $11,142,328 and $14,139,105 less in interest expense between domestic and export sales, for taxable years 1979 and 1980, respectively. Thus, CTI would have increased for the taxable years in issue, and so petitioner's DISC commission deductions would have likewise increased for said years.

(vii) If petitioner's DISC commission deductions had increased for the taxable years in issue, then petitioner's taxable income and ultimate tax liability would have decreased for said years.

(viii) Based upon paragraphs (i) through (vii), above, petitioner is entitled to a refund for income taxes paid for taxable years 1979 and 1980, which refund results from petitioner now computing its DISC commission deductions for said years by allocating its net interest expense between domestic and export sales, for purposes of calculating CTI.[5]

---

[5] Petitioner is in the process of computing the exact amount of its refunds for taxable years 1979 and 1980, which will result from allocating its net interest expense between domestic and export sales, for purposes of calculating CTI for the taxable years in issue.

(g)(2) Unreported DISC Sales Of Aircraft Engines.

(i) During the taxable years in issue, petitioner was engaged in the business of manufacturing and selling aircraft engines.

(ii) During taxable year 1979, GEISCO served as a commission agent in connection with petitioner's sales of aircraft engines, which were sold for direct use, consumption or disposition outside of the United States. For taxable year 1979, petitioner reported DISC sales of $319,357,274, and a DISC commission of $28,587,092, with respect to its sales of aircraft engines.

(iii) During taxable year 1979, petitioner sold a number of aircraft engines to Boeing Aircraft, Inc. ("Boeing") and McDonnel Douglas Corporation ("MDC"). Boeing and MDC attached these aircraft engines to aircraft which they were manufacturing, and they ultimately delivered these aircraft for use, consumption or disposition outside of the United States.

(iv) The aircraft engines noted in paragraph (iii), above: (a) were manufactured in the United States by a person other than GEISCO; (b) were held by petitioner for sale in the ordinary course of its trade or business of selling aircraft engines; (c) had a fair market value that was not more than fifty percent attributable to articles imported into the United States; (d) were not sold or leased to a DISC (other than GEISCO) which was a member of the same group of controlled corporations (within the meaning of Treas. Reg. Sec. 1.993-1(k)) as GEISCO; (e) were attached to aircraft which were ultimately used, consumed or disposed of outside of the United States, within one year of the date when petitioner first sold

these aircraft engines to Boeing and MDC; and (f) were not subject to any further use (other than resale), manufacturing, assembly or other processing by either Boeing or MDC.

(v) Thus, the aircraft engines which are identified in paragraph (iii), above, constituted "export property", within the meaning of I.R.C. Section 993(c), and the Treasury Regulations issued thereunder.

(vi) Petitioner has recently determined that for taxable year 1979, it omitted to report the sales of aircraft engines identified in paragraph (iii), above, as DISC sales, even though these transactions would have qualified as DISC sales.

(vii) If petitioner had reported the sales of aircraft engines identified in paragraph (iii), above, as DISC sales, by allowing GEISCO to serve as its commission agent in connection with these sales, then petitioner's DISC sales with respect to aircraft engines for taxable year 1979 would have been $572,196,476, rather than its reported $319,357,274, and its DISC commission would have been $32,190,700, rather than its reported $28,587,092. Accordingly, petitioner's DISC commission would have increased by $3,603,608, for taxable year 1979.

(viii) Based upon paragraphs (i) through (vii), above, petitioner is entitled to a refund for income taxes paid for taxable year 1979, which refund results from petitioner recomputing its DISC commissions for taxable year 1979, to take into account

its export sales of aircraft engines to Boeing and MDC.[6]

(h) General Electric Real Estate Credit Corporation.

(i) In December of 1976, General Electric Real Estate Credit Corporation ("GERECCO") held an account receivable due from Park Place Developers, in the principal amount of $7,137,687. This account receivable arose from several loans which GERECCO had previously made to Park Place Developers.

(ii) On or about December 30, 1976, GERECCO sold this account receivable to General Electric Credit Corporation ("GECC"), a sister corporation, for $6,437,687. GERECCO realized a $700,000 loss in this transaction ($7,137,687 - $6,437,687); however, under the consolidated return regulations, Treas. Reg. Sec. 1.1502-1 et seq., this loss constituted a "deferred intercompany transaction", and so GERECCO's loss was required to be deferred.

(iii) For taxable years 1976 and 1977, GECC claimed partially worthless bad debt deductions of $3,676,000 and $260,324, respectively, arising from the Park Place Developers account receivable. By December of 1980 though, GECC had collected the entire principal amount of said account receivable, and so pursuant to the tax benefit rule, GECC reported $3,936,324 in income, which was the sum of its 1976 and 1977 partially worthless bad debt deductions for the Park Place Developers account receivable.

(iv) Upon the Internal Revenue Service's audit of GECC for taxable years 1976 and 1977, the parties ultimately agreed that

---

[6] Petitioner is in the process of computing its refund for taxable year 1979, which results from treating its sales of aircraft engines to Boeing and MDC as DISC sales.

GECC was not entitled to its claimed partially worthless bad debt deductions with respect to the Park Place Developers account receivable. The Service subsequently agreed to reduce GECC's income in the amount of $3,936,324 for taxable years 1979 and 1980, which was the amount GECC had previously reported in income under the tax benefit rule.

(v) Since the Park Place Developers account receivable was paid off in full by December of 1980, GERECCO is entitled to deduct its $700,000 deferred loss from said account receivable for taxable year 1980. See Treas. Reg. Sec. 1.1502-13(f)(1)(v).

(vi) Based upon paragraphs (i) through (v), above, GERECCO is entitled to a refund for income taxes paid for taxable year 1980, in the amount of approximately $322,000.

(i) Foreign Tax Credits.

(i) After petitioner filed its Federal income tax returns for the taxable years in issue, General Electric Information Services Co. ("GEISC"), a wholly-owned subsidiary of petitioner, paid additional income taxes to the Government of Germany for taxable years 1979 and 1980, in the amounts of $67,045 and $172,549, respectively.

(ii) With respect to these additional income taxes paid by GEISC, petitioner is entitled, under I.R.C. Sections 901, 902 and 905, to additional foreign tax credits for taxable years 1979 and 1980, in the amounts of approximately $67,045 and $172,549, respectively.

(j) Correlative Adjustments From 1977-1978.

(i) On or about November 21, 1988, the Service mailed a statutory notice of deficiency to petitioner for taxable years 1977 and 1978. On or about February 17, 1989, petitioner filed a petition with this Court for redetermination of respondent's asserted deficiencies for taxable years 1977-1978.

(ii) Petitioner and respondent subsequently reached a basis for settlement with respect to taxable years 1977-1978. To the extent this settlement requires that correlative adjustments be made to petitioner's 1979 and 1980 taxable years (i.e., a deduction which petitioner accrued for taxable year 1978 is determined to be properly accruable for taxable year 1979), then petitioner reserves the right to claim these correlative adjustments in the instant proceeding.

WHEREFORE, petitioner prays that this Court may hear the case and: (i) determine that there is no deficiency in income tax due from petitioner for the taxable years 1979 and 1980; (ii) determine that petitioner is entitled to refunds in income taxes paid for taxable years 1979 and 1980; and (iii) grant petitioner such other and further relief as the Court may deem fit and proper.

LAURENCE A. HOCH
Tax Court No. HL0321

G. Markell Fluckiger
Tax Court No. FG0209

CRAIG L. SIGWORTH
Tax Court No. SC0664

Attorneys for Petitioner
GE Corporate Taxes
12 Corporate Woods Blvd.,
3rd Floor
Albany, NY 12211
Tel. No. (518) 433-4349

Dated: June 29, 1992